SIMEON STODDARD, CURTIS STODDARD, DANIEL STODDARD, ANTHONY STODDARD, WILLIAM STODDARD, JOSEPH BUNNELL AND LUCY HIS WIFE, JONAS FOSTER AND LAVINIA HIS WIFE, LUCY HOXIE, DANIEL MORGAN AND AVA HIS WIFE, PLAINTIFFS IN ERROR, *v.* HARRY W. CHAMBERS.

A deed of land in Missouri, in 1804, attested by two witnesses, purporting to have been executed in the presence of a syndic, presented to the commissioners of United States in 1811, and again brought forward as the foundation of a claim before the commissioners in 1835, must be considered as evidence for a jury If it was not objected to in the court below, it cannot be in this court.

A confirmation under the act of 1836 to the original claimant and his legal representatives, enured, by way of estoppel, to his assignee.

Stoddard et al. v. Chambers.

To bring a case within the second section of the act of 1836, so as to avoid a confirmation, the opposing location must be shown to have been made "under a law of the United States."

The holder of a New Madrid certificate had a right to locate it only on "public lands which had been authorized to be sold." If it was located on lands which were reserved from sale at the time of issuing the patent, the patent is void.

There was no reservation from sale of the land claimed under a French or Spanish title between the 26th of May, 1829, and the 9th July, 1832. A location under a New Madrid certificate, upon any land claimed under a French or Spanish title, not otherwise reserved, made in this interval, would have been good.

If two patents be issued by the United States for the same land, and the first in date be obtained fraudulently or against law, it does not carry the legal title.

A patent is a mere ministerial act, and if it be issued for lands reserved from sale by law, it is void.

THIS case came up, by writ of error, from the Circuit Court of the United States for the district of Missouri.

It was an ejectment brought by the plaintiffs in error (who were also plaintiffs in the court below) against the defendant. The title of the plaintiffs was derived through their ancestor, Amos Stoddard, from an old Spanish concession, granted in 1800; and that of the defendant, to forty-seven acres and twenty-one hundredths of an acre, from what is called a New Madrid patent, issued to one Peltier under the act of Congress passed on the 17th February, 1815, ch. 198. The defendant also claimed one acre and sixty-three hundredths under a certificate granted, under the same act, to one Coontz, for which a patent had not issued. Beyond these forty-eight acres and eighty-four hundredths of an acre, the defendant set up no claim.

The historical order of the facts in the case is this.

On the 21st of January, 1800, Mordecai Bell, a resident of Louisiana, presented a petition to Don Carlos Dehault Delassuse, lieutenant-governor and commandant-in-chief of Upper Louisiana, praying for a concession of 350 arpens of land.

On the 29th of January, 1800, Delassuse made the concession and instructed the surveyor, Soulard, to put the petitioner in possession of the land conceded.

On the 29th of May, 1804, Bell conveyed the concession and order of survey to James Mackay. The original deed was in French, and purported to be executed before Richard Caulk, syndic of the district of St. Andrew. The names of two attesting witnesses are also subscribed.

On the 2d of March, 1805, Congress passed an act "for ascertaining and adjusting the titles and claims to land within the territory of Orleans and the district of Louisiana;" the general purport of which was to recognise all existing grants. It further provided for the appointment of three persons, who should examine, and decide on, all claims submitted to them, and report the result to the secretary of the treasury, who was directed to communicate it to Congress.

On the 26th of September, 1805, James Mackay conveyed the grant and order of survey to Amos Stoddard, who was at that time civil commandant, under the government of the United States, at St. Louis. It may here be remarked that evidence was given on the trial below that as early as 1817, Stoddard was in possession under this deed, and that the facts of his death before the suit and of the plaintiffs being his heirs at law were also given in evidence.

In January, 1806, Soulard, the surveyor-general of the territory of Louisiana, but not so under the authority of Congress, made a plat and certificate of the survey of the above land.

On the 3d of March, 1807, Congress passed another act relating to land-titles in Missouri, explanatory and corrective of the act of 1805. It also extended the time limited for filing the claims to the 1st of July, 1808.

On the 29th of June, 1808, all the papers relating to the claim were presented to the recorder of the district, viz.: 1. The concession. 2. Deed to Mackay. 3. Deed to Stoddard. 4. Certificate of survey in favour of Stoddard.

On the 15th of February, 1811, Congress passed an act, by which the President was authorized, (section 10,) "whenever he shall think proper, to direct so much of the public lands lying in the territory of Louisiana as shall have been surveyed in conformity with the eighth section of this act, to be offered for sale;" and further, "That all such lands, with the exception of the section number sixteen, which shall be reserved for the support of schools within the same; with the exception, also, of a tract reserved for the support of a seminary of learning, as provided for by the eighth section of this act; and with the exception, also, of the salt springs and lead mines, and lands contiguous thereto, which, by the direction of the President of the United States, may be reserved for the future disposal of the said states, shall be offered for sale to the highest bidder, under the direction of the register of the land-office and the receiver of public moneys, and of the principal deputy-surveyor, and on such day or

days as shall, by public proclamation of the President of the United States, be designated for that purpose:" "Provided, however, that, till after the decision of Congress thereon, no tract shall be offered for sale, the claim to which has been in due time, and according to law, presented to the recorder of land-titles in the district of Louisiana, and filed in his office, for the purpose of being investigated by the commissioners appointed for ascertaining the rights of persons claiming lands in the territory of Louisiana."

On the 3d of March, 1811, Congress passed another act, in which the same reservation is made as is above stated.

On the 10th of October, 1811, the board of commissioners rejected the claim.

On the 17th of February, 1815, Congress passed an act declaring that any person or persons owning lands in the county of New Madrid, in the Missouri territory, with the extent the said county had on the tenth day of November, 1812, and whose lands had been materially injured by earthquakes, should be and they were thereby authorized to locate the like quantity of land on any of the public lands of said territory authorized to be sold.

On the 28th of November, 1815, Fredcrick Bates, recorder, &c., issued a certificate that a lot of one arpent, in the village of Little Prairie, in the county of New Madrid, owned by Eustache Peltier or his legal representatives, was materially injured by earthquakes, and that said Eustache Peltier, or his legal representatives, was entitled to locate any quantity of land not exceeding 160 acres, on any of the public lands in the territory of Missouri, the sale of which was authorized by law.

On the 24th of October, 1816, an entry was made of land in conformity with the above certificate. This entry covered forty-seven acres and twenty-one hundredths of the concession to Bell; and the defendant claimed under it.

In 1817, 1818, and 1819, the township in which the land in controversy lies, was surveyed under the authority of the United States, and not offered at public sale by the authority of the President until 1823.

In March, 1818, the certificate which had been issued in favour of Peltier was surveyed by Brown, the deputy-surveyor, and the location made. It may here be remarked that evidence was given upon the trial, showing the possession of Peltier's location to have been in him and his assignees from 1819 down to the occupancy of the defendant, accompanied by deeds.

On the 29th of May, 1818, Martin Coontz made an entry under a New Madrid certificate, which was surveyed in July, 1818. · This survey clashed with Bell's concession, and included one acre and sixty-three hundredths, which the defendant, Chambers, claimed under Coontz's title. Coontz did not obtain a patent for it.

On the 26th of May, 1824, Congress passed another act, " enabling the claimants to lands within the limits of the state of Missouri and territory of Arkansas to institute proceedings to try the validity of their claims." It allowed any persons claiming lands under old grants or surveys, under certain circumstances, to present a petition to the District Court of the state of Missouri, which court was authorized to give a decree in the matter, reviewable, if need be, by the Supreme Court of the United States. The 5th section provided that a claim not before the District Court in two years, or not prosecuted to final judgment in three years, should be for ever barred both at law and in equity; and the seventh section directed that where a claim, tried under the provisions of the act, should be finally decided against the claimant, or barred by virtue of any of the provisions of the act, the land specified in such claim should, forthwith, be held and taken as a part of the public lands of the United States, subject to the same disposition as any other public land in the same district.

On the 26th of May, 1826, an act was passed continuing the above act in force for two years.

On the 24th of May, 1828, another act was passed, by which the act of 1824 was continued in force for the purpose of filing petitions, until the 26th day of May, 1829, and for the purpose of adjudicating upon the claims until the 26th day of May, 1830.

On the 9th of July, 1832, Congress passed an " act for the final adjustment of private land-claims in Missouri," which authorized commissioners to examine all the unconfirmed claims to land in that state, which had been filed prior to the 10th of March, 1804. The commissioners were directed to class them, and at the commencement of each session of Congress, during said term of examination, lay before the commissioner of the general land-office a report of the claims so classed. The first class was to include the claims which ought, in their opinion, to be confirmed according to the laws and usages of the Spanish government; the second, those which ought not to be confirmed. The third section provided that the lands included in the first class should continue to be reserved from sale, as heretofore, until the decision of Congress should be made against

them; and those in the second class should be subject to sale as other public lands.

On the 2d of March, 1833, Congress passed another act, directing the commissioners to embrace every claim to a donation of land held in virtue of settlement and cultivation.

On the 16th of July, 1832, a patent was issued to Peltier for the land described in his survey.

On the 8th of June, 1835, the commissioners decided that 350 arpens of land ought to be confirmed to Mordecai Bell, or his legal representatives, according to the survey.

On the 4th of July, 1836, Congress passed an act confirming claims to land in the state of Missouri, by which it was declared that the decisions in favour of land-claimants, made by the above commissioners were confirmed, saving and reserving, however, to all adverse claimants, the right to assert the validity of their claims in a court or courts of justice; and the 2d section declared, that if it should be found that any tract or tracts thus confirmed, or any part thereof, had been previously located by any other person or persons' under any law of the United States, or had been surveyed or sold by the United States, the present act should confer no title to such lands in opposition to the rights acquired by such location or purchase.

The cause came on for trial at April term, 1842, in the Circuit Court. After the evidence was closed the counsel for the defendant prayed the court to instruct the jury,

1. That the plaintiffs are not entitled to recover in this action any land included in the patent issued to Eustache Peltier or his legal representatives.

2. That the plaintiffs are not entitled to recover in this action, any land which the jury may find, from the evidence, to be embraced in the location made in favour of Martin Coontz, or his legal representatives.

Both of which instructions the court gave. Whereupon the counsel for the plaintiff excepted.

*Lawless* (in writing) and *Ewing*, for the plaintiffs in error.
*Jones*, for the defendants.

*Lawless* referred to the facts in the case and the acts of Congress bearing upon them, and then proceeded thus:

The plaintiffs in error respectfully contend, that the instructions

given by the Circuit Court of the United States in this case are erroneous.

The counsel for the plaintiffs in error willl assume, as a proposition, self-evident, that the title of the plaintiffs, under Amos Stoddard and Mordecai Bell, is good as against the United States, and would, if no antagonist private title existed, or were set up, entitle the legal representatives of Amos Stoddard, under Mordecai Bell, to the possession of 350 arpens granted to Bell, surveyed for Amos Stoddard under Bell, and confirmed by the act of Congress of the 4th July, 1836, to Mordecai Bell and his legal representatives.

The validity of the claim of Amos Stoddard and Bell to the 350 arpens has been fully established by the decision of the commissioners, and the act of 1836.

If the land included in the grant to Mordecai Bell, and the survey under it in favour of Amos Stoddard, had never been located by the New Madrid speculator, or entered in the United States land-office, there would be, it is presumed, no doubt, after the act of 1836, of the right of Amos Stoddard or his legal representatives to enter upon that land, and use the same as their fee-simple estate and absolute property.

The question, then, that presents itself is, whether the title of Amos Stoddard and his heirs to the land surveyed for Amos Stoddard has been divested, since the date of the survey, and between that time and the 2d July, 1836, confirming the claim under Mordecai Bell.

The defendant did not seriously, in the court below, contend that the title of the plaintiff was not good against the United States, putting out of view the defendant's patent and the location and survey which formed the basis of that patent. But it was insisted on the part of the defendant, that the plaintiffs were only entitled to a right of relocation of the quantity contained in the survey made in favour of Amos Stoddard under Bell, because, by the second section of the act 4th July, 1836, the first section of which confirms the grant and survey of Stoddard under Mordecai Bell, it is provided, that where the land included in the confirmed claim has been entered or located, or otherwise disposed of by any act of Congress, then the confirmee shall only be entitled to a re-location of the same quantity on any public land theretofore authorized to be sold, and which has been actually offered for sale and remains unsold in the state of Missouri.

The defendant then contends that the land in question has been

disposed of by the United States within the terms and meaning of the second section of the act of 4th July, 1836, and concludes,

That, therefore, the plaintiffs cannot recover it in this action under the title by them shown.

Thus, as has been already submitted to this court, the question resolves itself into this, to wit:

Has the title of Amos Stoddard and his legal representatives to the land in dispute been superseded, or destroyed, or divested, previous to the 4th July, 1836.

If the title of Amos Stoddard under Bell was still in being on the 4th July, 1836, it is manifest that it must be still in being, inasmuch as no act of Congress can, constitutionally, deprive a citizen of his lawful estate in land by a mere enactment. The second section of the act of 1836 pre-supposes that the sale or location, or other disposition of the land included in the grant confirmed by the first section, were such sales, locations, or other disposition as the act of Congress and the law in force at this date justified.

This position cannot be assailed, unless by assuming the unconstitutional doctrine that Congress could enact the destruction of a citizen's title to his land, and dispense with the action of a court and jury.

It would seem to be exceedingly disrespectful to the Congress of the United States to attribute to that body any such intentions; and not less disrespectful to this high court to imagine, that, if Congress so enacted or so intended to enact, this court would sustain such spoliatory and unconstitutional legislation.

The counsel for the plaintiffs in error will, therefore, take his stand on his above constitutional position, and from that elevated ground examine the defendant's title.

The title, as has been seen, consists of—

1. A New Madrid certificate; issued in favour of Eustache Peltier, for 160 acres of land.

2. A location filed in the office of the surveyor-general, at St. Louis, by a purchaser, under Peltier, of said certificate.

3. A survey of said location, made at the instance of said purchaser and locator by the surveyor-general.

4. A patent issued to said Eustache Peltier, and his legal representatives, for said 160 acres, as located and surveyed, and by virtue of said location and survey.

The counsel for the plaintiff, for the purpose of his argument, will

assume, as *res adjudicata,* that, if it be shown that the United States had no title to the land described in the patent to Eustache Peltier, that patent is void as against the confirmee, under the act of 4th July, 1836.

In the case of Polk's Lessee *v.* Wendell, 9 Cranch Rep. 99, the Supreme Court of the United States lays down the doctrine, "that there are cases in which a grant is absolutely void, as when the state has no title to the thing granted, or when the officer had no authority to issue the grant. In such cases, the validity of the grant is necessarily examinable at law."

The facts upon which the Supreme Court decided, in Polk's case, showed that the state of North Carolina attempted to grant lands to which she had no title or authority to grant. The court therefore pronounced her patent to be void.

If, in the case now before the court, the patent to Eustache Peltier and his legal representatives conveyed the land described in it, it must be because this land had been previously divested out of Amos Stoddard, under Mordecai Bell, and had become merged in the public domain, and part thereof.

If the land had not been so reunited to the public domain, it is contended, that neither Eustache Peltier nor his assigns could have lawfully located upon it, or have caused their location to be surveyed; or, if the location and survey were to be made on their mere demand, by the instrumentality of the surveyor-general of the United States, at St. Louis, without any discretion on his part to refuse the location and survey, then, although, strictly speaking, the location and survey were made according to the letter of the second section of the law of 1815, yet it must have been at the risk of the locator, and those claiming under him.

The counsel for plaintiff in error will now, therefore, proceed to demonstrate that, at the date of the location under Eustache Peltier, the title was not divested out of Amos Stoddard, under Bell, in the land so located, but was actually reserved from sale or disposition by the United States, until the claim to it of Amos Stoddard, under Bell, was finally passed upon by the proper authority.

It is in evidence in this case, that the claim of Amos Stoddard, under Bell, to the land in Peltier's location had been duly filed long previous to the act of 15th February, 1811. By reference to that act, section 10, (2 Story's Laws United States, p. 1178,) it will be seen that the President of the United States was authorized, whenever

he shall think proper, to direct so much of the public lands," &c. [Here the counsel quoted that part of the act, which is set forth in the statement of the case by the reporter.]

By the act of Congress of 17th February, 1818, (3 Story's Laws, p. 1659,) sect. 3, it is provided, "that whenever the land-office shall have been established in any of the districts aforesaid, (created by the first section,) and a register and receiver of public moneys appointed for the same, the President of the United States shall be, and is hereby, authorized to direct so much of the public lands lying in such district as shall have been surveyed according to law, to be offered for sale, with the same reservations and exceptions, in every respect, as was provided for the sale of public lands in the territory of Louisiana, by the tenth section of an act entitled, 'An act providing,' &c., being the same act above referred to."

As has been observed, it is in evidence in this case, that the land located and patented under Peltier was included in a claim which was in due time, and according to law, presented to the recorder, and filed in his office, and therefore was reserved specially from sale, by the acts of 1811 and 1818.

It is also in evidence, that the claim was actually included in a list printed and published, at the instance of the recorder at St. Louis, in pursuance of instructions from the United States land-department, of lands reserved from sale in the district of St. Louis. It was not contended by the defendant's counsel that if the land in dispute had constituted part of a lead-mine tract, or included, or was adjacent to, a salt-spring, or formed part of land reserved for public schools or state seminaries, the location by Peltier's vendee could have held the land, or that a patent could have cured the defect of the location.

Nor, as the counsel for the plaintiff understands their argument, do they contend that the land included in Amos Stoddard's claim was not reserved under the acts of 1811 and 1818.

But, to get rid of the difficulty, they contend, that the words in the New Madrid act of 1815, section 1, "Any person or persons owning lands in the county of New Madrid, in the Missouri territory, with the extent the said county had on the tenth day of November, 1812, and whose lands have been materially injured by earthquakes, shall be, and they are hereby authorized, to locate the like quantity of land on any of the public lands of said territory authorized to be sold," ought to be construed to mean lands which, at any time after

the New Madrid location was made, should become public land, and as such might be authorized to be sold.

And then the counsel for defendant endeavour to show, that subsequent to the date of the location under Peltier, the land did, in fact, become public land, and might have been authorized, by the President of the United States, to be sold.

The plaintiff's counsel will now proceed to demonstrate, in refutation of the above doctrine of the defendant, that—

1. The location, or the right of location, was confirmed by the act of 1815 to the owner of the lands injured, whoever he might be at the date of the passage of the act, and not to his assignee or vendee after the date of the act, as in the case before the court.

2. That the words in the act, "the sale of which is authorized by law," mean, not land the sale of which, after the location made, might be authorized by law, but land, and that, too, public land, which, in conformity to the acts of 1811 and 1818, before adverted to, were actually authorized by the President to be sold.

3. That the land included in the claim of Amos Stoddard, under Bell, upon which the locations under Eustache Peltier, and also under Martin Coontz, have been made, never has become, at any time, public land authorized to be sold.

In support of our first objection, namely, that the act does not authorize a location by an assignee whose assignment bears date subsequent to the passage of the act, the court is referred to the specific provision in the first section, which confines the right to locate to the owner of the land injured. The court will see, by reference to the record, that the locator under the certificate to Peltier, and also to Coontz, was not the owner of the land insured at the date of the passage of the act.

It is true, that in many, perhaps most cases, those locations have been made by persons who were not the owners, but it is submitted that this practice cannot have the effect of changing a positive law, particularly when it is considered that this practice was introduced for the benefit of mere speculators.

It is matter of record, and we may add, of authentic history, that, under this abusive practice, the New Madrid law has been perverted to the purposes of gross fraud upon the government of the United States, and to the spoliation (as in the present case is attempted) of private owners. The counsel for the plaintiffs in error respectfully submit, that when the act of 1815 is sought to be converted into a

species of penal law operating a forfeiture as against private owners, whose titles and claims were, at the date of that act, matters of record, that act ought to be construed strictly.

If the question were now between the United States and locator, there might, perhaps, be some ground for a liberal construction. It might be contended, that the surveyor-general, who filed the location and surveyed it, being an officer and agent of the United States, his act as against his principal ought, if possible, to be binding. But this sort of reasoning surely cannot be endured where the question is between a total stranger to the surveyor-general and a tortious locator who, at his own risk, has thought proper to file a location calling for land not public, and not authorized to be sold, and availing himself, for manifestly tortious and unjust purposes, of the instrumentality of a purely ministerial officer.

In support of the position, that the words in the act, "the sale of which is authorized by law," must be taken to mean, 1st, public lands; 2d, lands authorized to be sold according to the provisions, and "with the same reservations and exceptions in every respect," contained in the 10th section of the act of 1811, and in the act of 1818, before referred to, the plaintiff's counsel beg to call the attention of the court to the specific terms of those two acts, and to their manifest object.

The counsel for plaintiff would also refer to the New Madrid act, in which, besides the words, "the sale of which is authorized by law," specifically provides, that "no such location shall include any lead mine or salt spring."

By those acts of 1811 and 1818, it seems too clear for argument, that until the sectional lines were run, the president was not authorized to sell the land. The survey is directed to be made by those acts, in conformity with the established system of public surveys. The general object of that system is to designate, beyond all doubt, in all future time, the boundary lines and the quantity of land included within them. The special object in Missouri was, besides, to ascertain the location and quantity of all those lands reserved and excepted from sale in those acts.

It was impossible that the objects, therefore, in view could be attained without a survey having been previously made by the United States.

It was impossible, with any accuracy, to ascertain the location or quantity of mineral land—of salt-spring land. It was also impossible

to know where the 16th section fell, without survey. It was equally impossible to know the ground covered by claims " duly filed with the United States recorder," without such survey.

It is manifest, that the act of 1815 (New Madrid act) provides for all this by requiring the location to be made, not only on public land, but public land authorized to be sold.

By the terms of the acts of 1811 and 1818, (and as to lead mines and salt-springs, the New Madrid act itself,) a great extent of public land was excepted from sale. The President had no power to proclaim such lands for sale. But the act of 1815 requires that the location be not made on those lands. How, then, was the locator, or the officer who filed the location to know when it was made, whether it interfered with lands which, though public, were not to be sold?

While on this part of the subject before the court, the counsel for the plaintiff in error would refer the court to the opinions of a distinguished attorney-general of the United States, the late William Wirt. They are to be found in the " Opinions of the Attorneys-General of the United States, from the beginning of the Government to March 1st, 1831 ;" (published under the inspection of Henry D. Gilpin, in 1841.) In this letter of the 11th May, 1820, to the secretary of the treasury, (page 263,) Mr. Wirt says : 1st, That " the act attaches no assignable quality to the charity it bestows," or " to make those charities a subject of speculation ;" 2d, That " it was not the intention of Congress, in authorizing the sufferers ' to locate the like quantity of land on any of the public lands of the said territory which is authorized by law,' to change or affect in any manner that admirable system of location by squares, which had been so studiously adopted in relation to all the territories."

In his letter of the 19th June, 1820, (page 273,) Mr. Wirt specifically gives it as his opinion, that the sale is not authorized by law until the sectional lines are run, and consequently all locations previously made by those sufferers (New Madrid) are unauthorized.

The counsel for the plaintiff in error begs leave to refer to those letters of Mr. Wirt, as strongly in support of the objection taken to the location in this case, because of its having been made by an assignee. It does not appear that the person who signed the locations filed in this case with the surveyor, had any power of attorney so to do. He acted for himself and for his own benefit, and not for that of the " sufferer." The opinion of Mr. Wirt as to the necessity

of a previous survey of the township, is clear and explicit, and, besides, has been assented to by Congress.

By the act of 26th April, 1822, it is enacted, by section 1, " that the locations heretofore made, of warrants issued under the act of the 15th February, 1815, if made in pursuance of that act in other respects, shall be perfected into grants in like manner as if they conformed to the sectional or quarter sectional lines of the public surveys;" and by section 2, " That hereafter holders and locators of warrants shall be bound, in locating them, to conform to sectional lines as nearly as the respective quantities will admit."

The above act would not have been necessary if Mr. Wirt's opinion was not adopted by Congress, or if it had been erroneous. The act was obtained, as many acts unfortunately have been, to suit the purpose of speculators, and to cure defects in their locations.

This act, however, cannot operate beyond its import and terms. It cannot make a location valid against a private owner, when, in its origin it was void. The only effect that, according to principles of sound justice and jurisprudence, ought to be given to this act, is merely to make good a location and survey, notwithstanding that it did not originally, or did not at date of the act, coincide with sectional lines. But it is contended by plaintiff's counsel that, whenever it shall appear that the location in other respects did not conform to the terms of the act, it shall not become available under the above act.

Mr. Wirt, in his above opinion, only adverted to one object in view of Congress, but he might also, with equal propriety, have urged the necessity of survey, in order to ascertain the location and quality of those public and private lands which were excepted or reserved from sale, and which could not be ascertained until the public surveys had been made, returned, and approved.

As has been observed, it is in evidence in this case, that the surveys of the township in which the land in dispute is situated were not returned till 1822, and that, at the date of those locations under Peltier and Coontz, respectively, no survey at all had been made by the United States

The court is also referred to the opinion of the attorney-general, Wirt, in his letter of the 10th October, 1825, (p. 558,) which is adverse to the legality of locations on land included in a claim duly filed. Mr. Wirt, it will be seen in this letter, refers, in aid of his opinion, to an official letter, dated 10th June, 1820, of the then

secretary of the treasury, Mr. Crawford. The construction put by Mr. Wirt upon the words, " the sale of which is authorized by law," in the act of 1815, has been adopted by the United States' land department, and has been reiterated in divers letters and opinions of the solicitor of the United States' land-office, and by the attorney-general of the United States.

For the opinion of Attorney-General Butler, the court is referred to ("Opinions," page 1199,) the letter of the attorney-general, of 11th August, 1838, in which he adopts the views of Mr. Wirt, and in this very case of Mordecai Bell uses these words: "In the case of Mordecai Bell, whose claim to 350 arpens is confirmed by the act of July 4, 1836, I am of opinion, that the tract of six acres and twenty-eight hundredths, included in the survey, and previously confirmed by the old board of commissioners, must be regarded as clearly held by a prior title; but that Bell's claim will be valid for the residue, notwithstanding the survey includes two tracts located, and another patented, under the New Madrid law. These cases must stand on the same ground as those noticed in the case of Mackay, because the lands embraced in the act of 1836 were equally reserved from sale."

The above opinions, though not judicial authorities, are referred to in aid of the humble argument of the plaintiff's counsel, and, in particular, are referred to as repelling any conclusion that may be drawn in favour of those locations, from what has been (very erroneously, as it is conceived) denominated contemporaneous construction and practice.

Those opinions of the law officers of the United States, of the commissioner of the general land-office, and of the secretary of the treasury, can alone be referred to, to ascertain the construction that was in fact given to the New Madrid law. The acts done under that law in Missouri were *ex parte*, and interested acts, or purely ministerial acts done by an officer whom the law rendered a mere instrument of the locator. Acts of this sort can claim no respect as demonstrating contemporaneous construction, or as establishing a lawful custom.

The court will see, on reference to the second section of the New Madrid law, that—

1. The recorder was bound to issue the certificate on the oath or affirmation of a competent witness, that any person was entitled to a tract under the provisions of the act.

2. That, upon such certificate being issued, and the location made,

on the application of the claimants, it was made the duty of the principal deputy-surveyor to cause the survey to be made thereof, and to return a plat of each location to the recorder.

3. That the recorder was directed to record the location and plat in his office, and was to receive from the claimant the sum of two dollars for receiving proof, issuing the certificate, and recording the plat as aforesaid.

4. By section 3, the recorder was obliged to issue a patent certificate to the claimant.

5. The executive of the United States was bound, upon the exhibition of the patent certificate, to issue the patent.

Thus, in each of those five stages of the locator's title, the locator or claimant is *" actor reus, et judex."*

He first designates the land by his location, which designation was filed as of course. He then demands a survey of that location, which the surveyor-general is obliged to make. He then demands, upon the strength of the location and survey, a patent certificate; and, armed with this certificate, he proceeds to Washington city, and demands his patent, which, by the terms of the third section of the act, the executive of the United States is bound to give him.

It is true, that Mr. Wirt, in his letter of the tenth of October, 1825, gives it as his opinion, that the issuing of the patent was not so purely ministerial an act as to dispense with, on the part of the President, all consideration of the location and survey on which it was founded; and therefore opposed the issuing of a patent to Mr. Bates, who demanded it under the provisions of the New Madrid act for land included in a claim duly filed, or which was then before a court of competent jurisdiction: but this opinion of Mr. Wirt, although the department was not in favour of the New Madrid location, does not appear to have prevented the issuing of the patent; doubtless, because the executive considered the act too imperative, or that, as a ministerial officer, he preferred to leave the whole question of title, as between the New Madrid locator and the claimant, to be decided by a court of justice. In this view, it would, perhaps, be difficult to establish that the executive of the United States was in error.

Having thus endeavoured, it is hoped satisfactorily, to demonstrate, that the whole of the proceedings on which the patent to Eustache Peltier was based were not only not in pursuance of the New Madrid law, but in direct violation of it, the counsel for the plaintiff in error

submit, as a logical and legal conclusion, that those proceedings, and a patent based on them, could not, in the least degree, weaken the claim of the plaintiff under Mordecai Bell, or divest the title, whatever it was, which at the date of the New Madrid act was in Bell and his legal representatives.

It has been urged at bar in the court below, on behalf of the defendant, and may be reiterated before the Supreme Court, that, admitting, for argument's sake, that the location was not good and valid at its date, it yet has become so by operation of certain acts of Congress, and that therefore the claimant under Bell can at most be entitled to a re-location under the second section of the act of 1836, under which he contends that his claim is confirmed. It has been strenuously argued, that he must take the title or the confirmation *cum onere*, or not at all ;—that he cannot control the mode in which Congress has thought proper to extend their charity towards him, nor escape from the conditions under which that charity has been bestowed. The counsel for the plaintiff might retort this argument on the defendant. Surely, if the claimant under a Spanish grant and survey be charged with mendicancy at the door of Congress, the New Madrid sufferer has, *à fortiori*, had charity—absolute alms, bestowed upon him. Surely it is he that must be bound by the strict terms and conditions of the gift, and not seek to enlarge it at the expense either of the United States or of private proprietors. There is nothing in the position of the defendant, who rather represents a New Madrid speculator than a New Madrid " sufferer," to call for any liberality of construction in his favour, especially when that liberality is avowed to be called for in order to effect a forfeiture, as against a party whose original right to his land has been solemnly recognised, first, by a board of commissioners, and afterwards by the Congress of the United States.

This argument of the defendant's counsel assumes as proved, what we contend has no existence, namely, that the land included in the claim of Amos Stoddard, under Mordecai Bell, confirmed by the act of 4th July, 1836, has been sold, located, or disposed of, according to law. If it has not been so " disposed of," it is manifest, that the confirmation by the first section of the act of 1836, carries the whole title, and that the second section of that act has no application, no subject-matter, to operate on.

We come now to the ground above adverted to, as taken by defendant's counsel, namely, that the location, though not good when

made, has become good by operation of certain acts of Congress on the claim of the plaintiff, and the land included in it. .

The counsel for defendant, in support of this position, referred to the acts of May 26, 1824, May 26, 1826, and May 24, 1828.

They contend, that, by the 5th section of the act of 1824, "a claim to land within the purview of that act, which shall not be brought before that court, or through neglect or delay of the claimant, shall not be prosecuted to a final decision within three years, shall be for ever barred, both at law and in equity; and no other action at common law, or proceeding in equity, shall ever thereafter be sustained in any court whatever in relation to said claims."

To this, the plaintiff replies, that this section of the act of 1824 (renewed, as we admit, by the acts of 1826 and 1828) can have no bearing whatever on the plaintiff's case or claim.

1. Because this section could not react on the proceeding, under the New Madrid law, and render legal and valid a location and survey that were void *ab initio*.

2. That the section, if it ever could operate to exclude the plaintiff in his claim from a court of justice, has been repealed by Congress, and the plaintiff remitted to all his right and title under the grant to Bell, by the acts of 1832 and 1833, which authorized him to place his claim before a board, in the same state of vitality and vigour in which it was when first filed with the recorder.

3. That the act of 4th July, 1836, has confirmed the claim and recognised it as entitled to protection by the treaty, and good and valid to all intents and purposes.

This third reason, brings us to the paramount character of the plaintiff's title; and, it is respectfully submitted, exhibits it as a title which Congress could not violate, even if they had so declared their intention to do.

The commissioners under the acts of 1832 and 1833 accompanied their decisions on the respective cases with a very full report and exposition of their views of the claims and titles which they were authorized to take under consideration, and the principles upon which their classification was made.

The principles thus laid down, by those commissioners, have not only been sanctioned by the act of Congress of the 4th July, 1836, but have been affirmed by the Supreme Court of the United States. In their report of the 31st September, 1835, the commissioners particularly refer to the case of Chouteau v. United States, and also to

the case of Delassus, under Deluzieres v. United States. The commissioners, in their report of 1833, adopted the principle, that when the grant, or the grant and survey, created a right of property, the claim ought to be placed in the first class as entitled to confirmation. In their second report of 1836, they reiterate this doctrine, and refer to the Supreme Court of the United States in support of it. They cite the very words of this court in the above cases. "In the first case," say they, "the Supreme Court lays it down that 'orders of survey, made by the lieutenant-governor of Upper Louisiana, are the foundation of title, and are capable of being perfected into complete titles; that they are property capable of being alienated; and is, as such, to be held as sacred and inviolate as other property.'" They also cite the language of the Supreme Court in the former case of Delassus v. United States, as follows: "The right of property is protected and secured by the treaty; and no principle is better settled in this country, than that an inchoate title to land is property: independent of treaty stipulations, this right would be held sacred. The sovereign who acquires an inhabited territory, acquires full dominion over it; but this dominion is never supposed to divest the vested rights of individuals to property. The language of the treaty ceding Louisiana excludes every idea of interfering with private property; of transferring lands which have been severed from the royal domain."

The question of the inviolability of the right of Amos Stoddard, under Mordecai Bell, is settled by the highest possible authority, legislative and judicial. It follows, as a clear consequence, that the New Madrid law ought to receive such a construction as is consistent with the above view of Congress and of the Supreme Court. It has been endeavoured to be shown, that, by a fair interpretation of the New Madrid act, no collision could take place between it and the treaty of cession on those principles, which, as the Supreme Court observes, independent of the treaty, would have protected the property of the plaintiffs in error; but it is respectfully, and confidently also, contended, that if the terms of the New Madrid act, or any other act of Congress, specifically purported to annul, or to violate the right of the plaintiffs, those terms must be disregarded, as unconstitutional.

It is not supposed, by plaintiff's counsel, that the merits of the claim of Stoddard, under Bell, can now become the subject of re-examination as against the United States, and with reference to the

validity of that claim when it was filed with the recorder. All that has been already passed on and settled in favour of the claim. The proceeding under the New Madrid law, passed in 1815, can have no bearing on the original merits of a claim filed under an act of Congress passed in 1805. It would seem that the counsel for the defendant have abandoned the objection to original validity of plaintiff's title, inasmuch as the instructions asked for by the defendant, and given by the Circuit Court, are predicated on the patent to Eustache Peltier, and on the location under Coontz. The *primâ facie* title of the plaintiff was not seriously disputed.

In addition to what has been already submitted by plaintiff's counsel, on the subject of Peltier's patent, and the grounds on which it may be successfully avoided in an action of ejectment, much more might be said, drawn as well from the decisions of this court as from the doctrine in England on the subject of royal grants of land. The court must be well aware, that in England a king's grant may be got rid of, by showing that, at the date of it the king had no title. It is contended, on behalf of plaintiff in error, that this doctrine should be, *à fortiori*, the law of the United States. The President of the United States is, as respects public land, a purely ministerial officer; whereas the title to public lands in England is vested in the king. There is no law, at least the counsel for plaintiff in error have not been able to find one, which imparts to a patent for land any peculiar virtue, or any greater efficacy in operation than that of an ordinary deed of quitclaim, signed, sealed, and delivered by an attorney in fact for and in the name of his principal. The counsel for the plaintiff in error, while they admit that a United States' land-patent constitutes a *primâ facie* title, and that a party cannot at law get behind it, and avoid it on the ground of irregularity in the previous formalities, do respectfully contend, that, when the proceedings on which the patent is founded are utterly void, or where it is shown that the United States had no estate in the land, or no right to grant the land, the *primâ facie* case made by the patent is rebutted.

In conclusion, the counsel submit that—

1. It appears from the record, that the plaintiffs in error claim a right, title, and estate, under a confirmation of a grant and survey vested in them as heirs-at-law of Amos Stoddard.

2. That their right and title is protected and consummated by treaty, and by act of Congress.

3. That the decision of the Circuit Court of the United States

has been against their title, so derived, guaranteed, and consummated.

4. That this decision of the Circuit Court of the United States is erroneous, and ought to be reversed.

*Jones*, for the defendants in error, said he would inquire,

First, As to the instrument by which the plaintiffs attempt to connect the title of Amos Stoddard with the original title (whatever it was) of Mordecai Bell, under the concession from the Spanish governor of Upper Louisiana; and upon which instrument necessarily depended any sort of right, at law or equity, in Stoddard to claim the rights vested in Bell by that concession.

This instrument purports to be executed by one Richard Caulk, styling himself syndic of the district of St. Andrews, and certifying that Mr. Bell was present before him, &c. It is produced as a record, upon its own authority. It cannot be set up as a private act; it is enough to say, that it is actually brought forward as a record. If so, it is invalid, unless it possesses the necessary requisites. Article 1132, of the Civil Code of Louisiana, changes the common law in this respect, and says, that an act not authentic from defect of form, &c., may avail as a private paper, if signed by the party. In 10 Louisiana Rep. 304, there is the case of a mortgage signed by a married woman, and some of the witnesses did not see her sign. The court set it aside, because it was produced as an authentic act. See, also, article 2233, adverted to in the case in 5 Martin, N. S. 68, 69. The distinction between authentic acts and private writings is shown in Partidas, title 18, p. 222, 235.

All the decisions of this court in Florida cases, show that persons must prove the authenticity of the paper under which they claim, and that local laws must be proved below, as foreign laws.

The office of syndic is explained in 6 Peters, Strother *v.* Lucas: he was only a subordinate police officer.

The preface to the translation of the Partidas, p. 20, shows that a proclamation of O'Reilly established syndics. There is no evidence in the case that they acted as notaries.

As to powers of commandants, see 3 Martin, 115. If this is not valid as an authentic paper, will the lapse of time make it so, as a private paper? It is true, that time is of great value in sustaining the muniments of title, where the property has been for a long time enjoyed: but in this case, the party who claims under this instrument never was in possession.

Secondly. As to Mordecai Bell's claim, which was confirmed by the board of commissioners on the 8th June, 1835, the plaintiffs, in their statement, say it was that identical claim which had been filed by Soulard with the recorder of land-titles, on the 29th June, 1808, laid before the board for their action, and rejected by them on the 10th October, 1811; as if the first decision against the claim had been subject to some condition or reservation, that kept the claim alive during all the twenty-four intervening years, and still pending before the board, for their further consideration and final decision.

This is a clear mistake. Mordecai Bell's claim was never filed with the recorder of land-titles, nor was it ever laid before the board for adjudication, till March 30, 1835; near nineteen years after Peltier's location, seventeen years after his survey, and two years and eight months after his patent; sixteen years and ten months after Coontz's location, and sixteen years and eight months after his survey. It was Amos Stoddard's claim alone, as assignee of Mackay, the pretended assignee of Bell, that was filed by Soulard, on the 29th June, 1808, with the recorder of land-titles; and definitively rejected by the commissioners, on the 10th October, 1811; and which, ever since that time to the commencement of the present action, a period of twenty-eight years, had lain quiet and silent under a judicial condemnation, unconditional and absolute in its terms—final in its effect.

But the claims of assignees and grantees are very different. An assignee, as such might establish his claim before the commissioners, who might, very properly, have confirmed the claim of Bell, as original grantee, without at all recognising the chain of title by which it is alleged that the present claimants hold Bell's right. In such a case, the plaintiffs would have no title; and the facts in this case leave it entirely doubtful, whether the commissioners did not intend so to decide. 10 Peters, 334; 6 Peters, 766.

What title did Bell acquire under the Spanish concession? He is called a grantee, but there was no land described by metes and bounds. The concession was nothing but an order of survey, but no ate vested. 12 Wheat. 599; 6 Peters, 200.

On 10th March, 1804, Spanish authority ceased, and that all the steps to acquire title were taken after that time. On the 29th of May, 1804, Bell conveyed the concession to Mackay, but the Spanish law had then entirely ceased. A survey, made by private authority, after the change of flags, is void. 10 Peters, 234.

Thirdly. As to the supposed confirmation of M. Bell's claim, itself, by the act of Congress of the 4th July, 1836, the plaintiffs produced no evidence whatever, of that claim's being among "the decisions in favour of land-claimants, laid before Congress by the commissioner of the general land-office," prior to the passing of that act; unless they rely on presuming that fact from another fact, certified on the 27th March, 1840, by F. R. Conway, recorder of land-titles in the state of Missouri; namely, that "said claim was included in the transcript of favourable decisions transmitted by the recorder of land-titles, and the two commissioners associated with him, to the commissioner of the general land-office."

The title alleged by the plaintiffs, as it appears on their own showing, is held utterly vicious and untenable; and if the defendant were stripped of all right and title, still the full right and title to the land in question would remain in the United States, without any sort of right in the plaintiffs to claim the land, either at law or equity. In support of this proposition, the following objections to the plaintiffs' title are held demonstrative and insuperable.

1st. The pretended act of sale and exchange from Bell to Mackay was utterly inoperative and void *ab initio*; and therefore the commissioners were fully sustained by the law and the fact of the case when they decided, as they must have decided, since they rejected Stoddard's claim and admitted Bell's, that Stoddard had failed to make out any valid claim in himself, derived through Mackay from Bell; and it is a fair if not a necessary presumption, under all the circumstances, that the specific defect, for which his derivative claim was rejected by the commissioners, was found in this broken link in the chain by which he attempted to connect his claim with the original title of Bell.

This instrument, throughout its whole frame and tenor, and in the manner of its execution, pursues the form and claims the authenticity and effect of a "public or authentic act" executed under official sanction, and equivalent to record evidence, as contradistinguished from a "private writing," to be proved in the ordinary way. Like all such acts, it speaks in the name and character of the officer who executed it, not of the parties. It was produced as such an act; as an act that "proves itself;" that is "full proof" in itself, without any proof of execution in the ordinary way. It must, therefore, be shown to be the very thing it professes and is claimed to be, or nothing; failing as an authentic act, it cannot, according to the known

laws of Louisiana, be set up as a private writing, nor was it attempted to be so set up.

The validity and effect of this instrument wholly depends on the legal competency of R. Caulke styling himself syndic of a district, to execute an authentic act in relation to contracts, and there is nothing to show, either that he was such syndic as he describes himself, or, being such, that he had any authority, in virtue of that office, to execute authentic acts. On the contrary, from all that is known of the office of a syndic, he was merely a municipal police officer, of very subordinate authority and functions; and is clearly excluded from every description of officer ever recognised by the laws and customs of Louisiana as having authority to execute such acts.

2d. But whatever may be now thought or said of the intrinsic force and effect of the instrument, if it were *res integra*, the decision of the commissioners against Stoddard's claim (unreversed and unquestioned as it has stood for so many years) is conclusive against the title now set up by the plaintiffs.

3d. If there had been no decision of the commissioners against the claim, it would have been equally beyond the cognisance of the court. No title derived from an imperfect Spanish grant, like that to Bell, could be set up, or in any manner recognised in any court of the United States, or of any state, till it had passed the tests provided by the acts of Congress; that is, till confirmed, first by the commissioners, then by Congress, and then regularly located and identified by survey, and lastly carried out into grant by a patent from the United States.

4th. Whatever title, whether an inchoate or a complete legal title, be vested by the decision of the commissioners, the confirmation of that decision by Congress, and the subsequent survey locating and identifying the land to which the claim was so confirmed, that title was vested in Bell exclusively.

But it is said by the counsel on the other side, that the deed of exchange between Bell and Mackay is a mutual warranty, which is an estoppel, and that an estoppel will support an ejectment. But this is not a case of estoppel, which is binding only on the donor and his heirs. If one makes a deed when he has no title and afterwards acquires one, he is estopped; but if he acquires a lesser estate than he has conveyed, there is no estoppel. 4 Cruise's Digest, 271, sect. 58, New York edition of 1834; 4 Kent's Commentaries, 98, 260, 261, 8 Barn. and Cres. 497.

In 1804, the assignee stood in the place of the original grantee, and had only a right to acquire land. What, then, is the warranty in the exchange? Only that the warrantor will not claim contrary to the grant; he does not warrant that the grantee shall have the land, because he could not warrant the faith of the Spanish or American government. 2 Barn. and Ad. 278.

The act of Congress interferes with the estoppel. As to the effect of an act of Parliament upon an estoppel, see 2 T. R. 169.

5th. Even Bell's claim is in no way shown to have been included in "the decisions in favour of land-claimants," which are referred to in the act of Congress of July 4, 1836, as being within its purview, and which are to be identified by reference aliunde.

II. The title vested in Bell himself is but inchoate and incomplete, and wholly incompetent to support the action of ejectment. The legal estate in fee, if not vested in the defendant, still remains in the United States.

As to the title of the plaintiffs, if they could set up any derivative claim under Bell; if they could establish the validity of the intermediate assignments under which they attempt to derive their claim from Bell; and if the Circuit Court could have taken original cognisance of any title so derived, and not having passed the tests aforesaid, (each and every of which hypotheses we deny,) still the plaintiffs show nothing more than an equitable right to call the legal estate out of Bell's hands, if such legal estate be vested in him, or otherwise to affect and appropriate such inchoate title as may be found vested in him.

III. As to the two objections taken to the defendant's title

Objection 1. That the locations and surveys of Peltier and Coontz were on lands not then for sale.

Answer. The description of the lands on which the entries and locations of the New Madrid land-warrants were allowed, was not limited to lands offered for sale, but to such lands as were not reserved from sale by the land laws of the United States.

Objection 2. That a claim for the land in dispute, under the Spanish grant or concession to Bell, was already before the commissioners for adjudication when those entries and locations were made, and so within the express exception of the act of Congress which authorized such entries and locations

Answer 1st. The claim before the commissioners was for no particular tract of land, distinguished by metes and bounds, or other-

wise, from the mass of public lands subject to the claim but simply for 350 arpens of land; to be afterwards duly laid off and surveyed. The survey by Stoddard, in 1808, was wholly unauthorized and void; and if he took any possession of the land so surveyed, it was but a naked and tortious possession of so much of the public lands. No special location of the land so claimed could be pretended till it came to be officially surveyed, May 26, 1837, "in conformity, as it is said, with the decision of the late board of commissioners, and in virtue of the confirmation thereof by the act of Congress approved on the 4th July, 1836."

Answer 2d. No claim for the land in dispute, or for any other land under the Spanish concession to Bell, was before the commissioners, either at the inception or consummation of the two titles vested in the defendant, and derived from Peltier and Coontz; nor till the lapse of many years thereafter, when Bell's claim was first laid before the board, in March, 1835. As to Stoddard's claim, it had been definitively rejected by the board six years before the very inception of those titles by the New Madrid land-warrants, and has never been, for an instant, *sub judice*, since its final rejection by the board in October, 1811, till the commencement of this suit.

*Ewing*, for the plaintiffs in error, and in reply.

We contend that the plaintiffs have the better title, and ought to have recovered against both the patent of Peltier, and the survey of Coontz.

The claim of Mordecai Bell was duly filed with the recorder of land-titles for the proper district on the 29th of June, 1808, pursuant to the provisions of the act of March 2d, 1805, ch. 86, sect. 4, and the act of April 21st, 1806, ch. 39, sect. 3, and the act of March 3d, 1807, ch. 91, sect. 5.

The concession was good. It is settled that Delassus had a right to grant. Land Laws, 542; 9 Peters, 146.

The defendant cannot now go behind the confirmation by the commissioners and by Congress. The claim was guarantied by treaty, and although no survey had taken place, Congress indirectly required us to make it. The act of March 2, 1805, ch. 86, directs all grantees from the Spanish government, including orders of survey, to file a plat, &c. It is true that there was no public survey made under the authority of Congress, for there was no public officer to do it. Soulard, who calls himself surveyor-general, was not so under

the authority of the United States. This is admitted. But he was recognised by existing legal authorities. He was the most proper man to make a private survey, which he did. The Supreme Court of Missouri has held his to be semi-official acts. There are hundreds of cases in the reports of the commissioners of surveys by this same man, and the commissioners took from his records a transcript for their own government. This claim is confirmed as having been surveyed. The act of 3d March, 1807, ch. 101, sect. 1 to 5, saves Spanish claims. In 1808, the commissioners refused to confirm this claim, but Congress continued to pass other laws, and no claim was considered to be finally disposed of because it was refused. This one remained on file until Congress should pass upon it.

By the act of February 15th, 1811, ch. 81, sect. 10, it is enacted, "That till after the decision of Congress thereon, no tract of land shall be offered for sale, the claim to which has been in due time and according to law presented to the recorder of land-titles in the district of Lousiana, and filed in his office, for the purpose of being investigated by the commissioners appointed for ascertaining the rights of persons claiming lands in the territory of Louisiana." The same provision is contained in the act of March 3d, 1811, ch. 113, sect. 10, and it is referred to and continued in the act of February 17, 1818, ch. 11, sect. 3.

The act of March 26th, 1824, ch. 173, which provides for the trial of Spanish claims in the district courts, and the supplementary act of May 24th, 1828, ch. 92, superseded and suspended this saving from the 26th day of May, 1829, until it was revived by the act of July 9, 1832, ch. 180, sect. 3.

As to our title before the confirmation.

The concession was in 1800, the assignment in 1804, the survey in 1806, which shows all the papers to have been in the hands of the surveyor. In 1808, Stoddart filed his claim before the commissioners. By the Spanish law the delivery of papers is equivalent to the delivery of the land itself. But the deed is formal enough. It was not the public act of a notary, but that was not necessary. One mode of conveyance is for a notary with two others to summon the parties before him and make up a record, which is itself a transfer of title; but another mode is by the party signing a deed. The Spanish laws are not accurately carried out in remote countries. Even in our distant settlements, a record is sometimes made up partly by parol. In 1769, O'Reilly says there were no lawyers in the country except

at New Orleans. In 1802, there were no notaries except at the same place. The people had been transferred often from one power to another, and must have been uncertain sometimes to whom they belonged. They executed deeds before any high officer whom they could find. Moralez implies that commandants might take acknowledgments of deeds. The syndic was next in authority to the commandant, with whom he acted sometimes as judge. 2 Land Laws, 204, 210, index.

By comparing O'Reilly, 2, 5, 12, with Moralez, 4, 5, 15, it will appear that the syndic was a judicial officer. The Partidas says that proof must be given that the officer was a public one, unless after a long lapse of time. In the preface to the Partidas, the syndic is mentioned after the alcaldes and before the attorney-general. If, therefore, the deed from Bell was not exactly in a regular form, it was in the customary way.

The claim was prosecuted by Stoddard and not Bell until it was rejected. But this decision was not final, as the act of 1832, ch. 180, (4 Story, 2305,) authorized the commissioners to proceed on all rejected claims standing on the records of the former commissioners, with or without a fresh presentation. The claim was confirmed to Bell or his legal representatives. Ten or twelve other cases are just in the same way. Senate Doc. for 1835—6, vol. 2, doc. 16, pp. 7, 15, 33, 69. In these cases the claim is made by the assignee, and the confirmation is to the original party or to his legal representatives. As to the meaning of this expression, see 12 Peters, 458, Strother and Lucas.

Bell is estopped, or rather rebutted from saying that the confirmation is not to Stoddard, for he had conveyed to Stoddard with warranty, which amounts to an estoppel. Co. Litt. 174 a, 384 b; 12 Johnson, 201; 13 Johnson, 316; 14 Johnson, 193; 1 Miss. Rep. 217. Title by estoppel is sufficient to maintain an ejectment. 1 Salkeld, 276; 2 Lord Raym. 1554; 6 Mod. 257, 259, same case as Salkeld, 3 P. W. 372.

Bell's deed is sufficiently proved before this court, because it was not objected to below. No one can allege an outstanding title in Bell, because he could not do so for himself.

This case, therefore, came within the acts of Congress which have been mentioned, and this land was reserved from sale. Congress looked only to the fact that the claim was legally filed, and not to the validity of the claim itself. Between 1829 and 1832, when the

reservation was withdrawn, entries were made and have been sustained by courts in Missouri. But these defendants did nothing in this interval. It is the same case as Bobeani and the Fort a Chicago. The land was reserved and the entry was void. See opinions of the law-officers of the government in the following volumes: "Opinions and Instructions," part 2, p. 12, sect. 3; p. 16, sect. 15; p. 25, sect. 23; p. 29, sect. 30. "Opinions of Attorney-General," Gilpin's Compilation, p. 1200, for the opinion of Mr. Butler, examining this very claim, dated August 8, 1838.

That a confirmation is a grant of the legal title, see 12 Peters, 454.

The defendant claims title under the act of February 17th, 1815, ch. 198, which authorizes a sufferer by earthquakes, in the county of New Madrid, having obtained his certificate to locate it "on any public land of the territory, the sale of which is authorized by law."

At the time of the locations of Peltier and Coontz, the sale of the land which they located was not authorized by law.

1st. Because the land was not surveyed, as it must be, before the sale was authorized; but if this be cured by the act of April 26, 1822, ch. 40.

2d. Because it was specially reserved from sale to abide the final decision of Congress on the claim of Mordecai Bell, which was duly filed, and then not finally decided by Congress.

The law reserving this land from sale was in full force at the time of the locations and surveys of both Peltier and Coontz, and also at the time of issuing the patent to Peltier.

The act of July 4th, 1836, ch. 361, which confirms the claim of Bell, also enacts, "that if it shall be found that any tract or tracts confirmed as aforesaid, or any part thereof had been previously located by any other person or persons under any law of the United States, or had been surveyed and sold by the United States, this act shall confer no title to such land in opposition to the rights acquired by such location or purchase."

We contend that the location, "under any law," must be a location authorized by such law. That this location was not so authorized, but, on the contrary, forbidden; that no rights were acquired by such location; and that, therefore, the saving does not protect the defendant's claim. Wilcox *v.* Jackson, 13 Peters, 510, 511, 513.

As to the mode of proceeding, we contend:

That the act of July 4th, 1836, is a grant, and confers a complete legal title on Bell, or his legal representatives. It is a confirmation

of a title before imperfect; that an action of ejectment may be sustained upon it on general principles. Rutherford v. Green's heirs, 2 Wheat. 196, 205; 12 Peters, 454.

And especially by the laws of Missouri. Revised Code of 1835. 13 Peters, 441, in note.

That the patent to Peltier having issued against law, for land reserved from location and sale, it is void. 13 Peters, 511.

If there was no incipient right, the patent does not vest a title. 1 Wash. C. C. Rep. 113, case of Alton Wood, 1 Rep. 45.

That the plaintiffs having a valid legal title, the inception of which was prior to that of defendant, and which is the better title, it will overcome the elder patent at law. Ross v. Doe, ex dem of Barland, 1 Peters, 662; Bagnell v. Brodrick, 13 Peters, 450, 454.

This point does not arise in that part of the case which depends upon the location and certificate of Coontz.

Mr. Justice McLEAN delivered the opinion of the court.

This case is from the Circuit Court of Missouri, and was brought here by a writ of error.

The plaintiffs brought an action of ejectment for 350 arpens of land, situated near St. Louis. Their title was founded on a concession by Delassus, lieutenant-governor, to Mordecai Bell, the 29th of January, 1800. Bell conveyed the same to James Mackay, the 29th of May, 1804, and on the 26th September, 1805, he conveyed to Amos Stoddard. A plat and certificate of the survey were certified and recorded by Antoine Soulard, as surveyor-general, the 29th of January, 1806.

The above papers were presented to the recorder of the district of St. Louis, the 29th of June, 1808. And the claim was duly filed with the board of commissioners for their action thereon, who, on the 10th of October, 1811, rejected it. But afterwards on the 8th of June, 1835, the board decided that 350 arpens of land ought to be confirmed to the said Mordecai Bell, or his legal representatives, according to the survey. And on the 4th of July, 1836, an act of Congress was passed, confirming the decision of the commissioners. The land was surveyed as confirmed. The plaintiffs proved the death of Amos Stoddard, before the suit was commenced, and that they are his heirs-at-law. The defendant was proved to be in possession of forty-eight acres and eighty-four hundredths of the land in controversy, one acre and sixty-three hundredths of which were in the

location and survey of Martin Coontz, and the residue within the patent of Peltier.

The title of the defendant was founded on an entry made by Peltier of 160 acres of land, by virtue of a New Madrid certificate, on the 24th of October, 1816. A survey of the entry was made in March, 1818, and a patent to Peltier was issued the 16th of July, 1832. Possession has been held under this title since 1819. The title was conveyed to the defendant.

On the 29th of May, 1818, an entry was made, which authorized the survey of Coontz, but no patent has been issued on it.

The township in which the above tract is situated was surveyed in 1817, 1818, and 1819, and was examined in 1822. Since 1804, a certain mound on the land has been called Stoddard's mound. In 1823 the proclamation of the President, published at St. Louis, directed the lands in the above township to be offered at public sale.

On the above evidence the court instructed the jury,

1. That the plaintiffs were not entitled to recover the land embraced in Peltier's patent.

2. That they were not entitled to recover the land embraced in Coontz's survey.

The decision of this controversy mainly depends on the construction of certain acts of Congress. By the act of the 2d of March, 1805, all persons residing in the territory of Orleans, who had claims to land under the French or Spanish government, were required to file their claims for record with the register of the land-office, or recorder of land titles, and provision was made for confirming them.

The time limited in the above act was extended by the act of the 3d of March, 1807, as regards the filing of claims with the register or recorder, until the 1st of July, 1808. By the act of the 15th of February, 1811, the President was authorized to have the lands which had been surveyed in Louisiana offered for sale; "provided, however, that till after the decision of Congress thereon, no tract of land shall be offered for sale, the claim to which has been in due time, and according to law, presented to the recorder of land-titles in the district of Louisiana, and filed in his office, for the purpose of being investigated by the commissioners appointed for ascertaining the rights of persons claiming land in the territory of Louisiana." The same reservation was repeated in the act of the 3d of March, 1811.

The act of the 26th of May, 1824, authorized claimants "under French or Spanish grants, concessions, warrants, or orders of sur-

veys" in Missouri, issued before the 10th of March, 1804, to file their petition in the District Court of the United States for the con firmation of their claims.    And every claimant was declared by the same act to be barred, who did not file his petition in two years." By the act of the 24th of May, 1828, the time for filing petitions was extended to the 26th of May, 1829.    On the 9th of July, 1832, an act was passed, " for the final adjustment of land-titles in Missouri," which provided that the recorder of land-titles, with two commission- ers to be appointed, should examine all the unconfirmed claims to land in Missouri, which had heretofore been filed in the office of the said recorder, according to law, prior to the 10th of March, 1804. And they were required to class the claims so as to " state in the first class what claims, in their opinion, would in fact have been con- firmed, according to the laws, usages, and customs of the Spanish government and the practice of the Spanish authorities under them. And secondly, what claims in their opinion are destitute of merit, law, or equity."    And by the third section it was provided, " that from and after the final report of the recorder and commissioners, the lands contained in the second class shall be subject to sale as other public lands; and the lands contained in the first class shall continue to be reserved from sale as heretofore, until the decision of Congress shall be against the claims of any of them; and the lands so decided against shall be in like manner subject to sale as other public lands."

These are the facts and statutory provisions which are material in the case.    The defendant, under the entry and survey of Peltier, holds the elder legal title to the land in controversy, except the one acre and sixty-three hundredths, which is covered by the entry and survey of Coontz.    Until the confirmation of the plaintiffs' title by the act of 1836, the legal title to the land claimed was not vested in the plaintiffs.

Objections are made to the intermediate conveyances under which the plaintiffs claim.    And first, it is insisted, that the deed from Bell to Mackay was not proved.    It is stated on the record, that there was no proof that R. Caulk, the syndic, before whom the deed was signed and acknowledged, had authority to act as such.

The deed was executed in 1804.    It was attested by two wit- nesses, and purports to have been acknowledged in the presence of a syndic.    There was no exception to the admission of this deed in evidence; and, consequently, the objections now made to its execu-

tion are not before the court. But if the execution of the instrument were now open to objections, they could not be sustained. Forty years have elapsed since this deed purports to have been executed. From that time to this, a claim under it seems to have been asserted. It was presented to the commissioners in 1811, having been filed with the recorder of land-titles, in 1808. And again, it was brought before the commissioners in 1835, it having remained on file until that time. Under these circumstances, the regular proof of the instrument might well be dispensed with. Possession, under this deed, was held by Stoddard for a time, and became so notorious that a certain elevation on the land was called Stoddard's mound.

Independently of the lapse of time, the unsettled state of the country at the time this instrument was signed, the transfers of the country from one sovereignty to another, the rude and defective organization of the government—the civil and military functions being blended, are facts which no court can disregard in acting upon transfers of property between individuals. If some degree of regularity and form were observed in regard to public grants, technical and legal forms cannot be required in the transmission of claims to land; among a people, the great mass of whom were ignorant of the forms of titles, and indeed, of almost every thing which pertained to civil government.

A syndic was not, in that country, an appointed officer, as he is in a regulated government; but the duties devolved upon the commandants of military ports, as occasion might require. There is nothing on the face of this deed to excite suspicion. It was attested by two witnesses, and contains the signature and certificate of the syndic. The genuineness of these attestations was not objected to on the admission of the deed as evidence, or on a motion to overrule it. The deed must, therefore, be considered as evidence to the jury, without exception. And, under all the circumstances, we think, that full effect should have been given to it, as a muniment of title. The deed from Mackay to Stoddard, the ancestor of the plaintiffs, is not objected to. Bell made the conveyance to Mackay, not having the legal title; but when, under the act of 1836, the report of the commissioners was confirmed to Bell and his legal representatives, the legal title vested in him, and enured, by way of estoppel, to his grantee, and those who claim by deed under him. A confirmation, by act of Congress, vests in the confirmee the right of the United States, and a patent, if issued, could only be evi-

dence or this. On a title by estoppel, an action of ejectment may be maintained.

If the claim of the defendant had not been interposed, no one could doubt the validity of the plaintiffs' title. It has the highest sanction of the government, an act of legislation: But the 2d section of the act of 1836, which gave this sanction, provided, "that if it should be found that any tract confirmed, or any part thereof, had been previously located by any other person or persons, under any law of the United States, or had been surveyed or sold by the United States, that act should confer no title to such lands, in opposition to the rights acquired by such location or purchase."

This provision, it is insisted, covers the case, and defeats the title of the plaintiffs. But, it must be observed, that a location, to come within the section, must have been made "under a law of the United States." Now an act under a law, means in conformity with it; and unless the location of the defendant shall have been made agreeably to law, or the patent were so issued, the reservation does not affect the title of the plaintiffs.

The holder of a New Madrid certificate had a right to locate it only on "public lands which had been authorized to be sold." Peltier's location was made in 1816, and his survey in 1818. The location of Coontz was made in 1818, and his survey in 1818. At these dates there can be no question that all lands claimed under a French or Spanish title, which claim had been filed with the recorder of land-titles—as the plaintiffs' claim had been—were reserved from sale by the acts of Congress above stated. This reservation was continued up to the 26th of May, 1829, when it ceased, until it was revived by the act of the 9th of July, 1832, and was continued until the final confirmation of the plaintiffs' title, by the act of 1836. The defendant's patent was issued the 16th of July, 1832. So that it appears, that when the defendant's claim was entered, surveyed, and patented, the land covered by it, so far as the location interferes with the plaintiffs' survey, was not "a part of the public land authorized to be sold."

On the above facts, the important question arises, whether the defendant's title is not void. That this is a question as well examinable at law as in chancery, will not be controverted. That the elder legal title must prevail in the action of ejectment, is undoubted. But the inquiry here is, whether the defendant has any title, as against the plaintiffs. And there seems to be no difficulty in answer-

ing the question, that he has not. His location was made on lands not liable to be thus appropriated, but expressly reserved; and this was the case when his patent was issued. Had the entry been made, or the patent issued, after the 26th of May, 1829, when the reservation ceased, and before it was revived by the act of 1832, the title of the defendant could not be contested. But at no other interval of time, from the location of Bell, until its confirmation in 1836, was the land claimed by him liable to be appropriated in satisfaction of a New Madrid certificate.

No title can be held valid which has been acquired against law; and such is the character of the defendant's title, so far as it trenches on the plaintiff's. It has been argued, that the first patent appropriates the land, and extinguishes all prior claims of inferior dignity. But this view is not sustainable. The issuing of a patent is a ministerial act, which must be performed according to law. A patent is utterly void and inoperative, which is issued for land that had been previously patented to another individual. The fee having been vested in the patentee by the first patent, the record could convey no right. It is true a patent possesses the highest verity. It cannot be contradicted or explained by parol, but if it has been fraudulently obtained or issued against law it is void. It would be a most dangerous principle to hold, that a patent should carry the legal title, though obtained fraudulently or against law. Fraud vitiates all transactions. It makes void a judgment, which is a much more solemn act than the issuing of a patent. The patent of the defendant having been for land reserved from such appropriation, is void; and also the survey of Coontz, so far as either conflicts with the plaintiffs' title. For the foregoing reasons, we think the instructions of the court to the jury were erroneous; and, consequently, the judgment must be reversed at the defendant's cost, and a *venire de novo* is awarded.

#### ORDER.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the district of Missouri, and was argued by counsel. On consideration whereof, It is now here ordered and adjudged by this court, that the judgment of the said Circuit Court, in this cause be, and the same is hereby reversed with costs; and that this cause be, and the same is hereby remanded to the said Circuit Court, with directions to award a *venire facias de novo.*