ALPHONZO N. DELAUNAY, appellant, v. MILTON G. BURNETT, appellee.

### Appeal from Jo Daviess.

The certificate of a Register or Receiver of any of the Land Offices of the United States to any fact or matter of record in his office, is competent evidence to prove the fact so certified in any Court in this State.

In an action of ejectment, an extract from a book purporting to contain the records of Commissioners appointed by the President of the United States, to determine claims to certain lots in Galena arising under certain Acts of Congress, was read in evidence, which book was identified by the testimony of one of the Commissioners as the record of their proceedings in adjudicating upon and determining the rights of the several claimants. In connection with this record, a permit from the proper officer to occupy a particular lot was also read to prove a pre-emption: *Held*, that the record was the proper and legitimate evidence to confirm the fact of such right of pre-emption, and taken in connection with the permit, established the right beyond controversy.

In a certificate of proof of a deed by testimony as to the handwriting of the subscribing witness thereto, it was stated that the witness called to prove such handwriting "was well acquainted with him:" *Held*, that this was a substantial compliance with the requisition of the statute, being equivalent to the declaration that he "personally knew him:" *Held*, also, that the statute does not require the officer to state that the witness, in such case, was "competent and credible."

The interest acquired by a pre-emption right is not an estate within any definition known to the Common Law. It is not an interest in the legal title, but merely a right of occupancy for the time being, with the privilege of purchasing at some future period at a stipulated price. Such interests, however, are regarded by the Courts of this State as property, which may pass by deed or other transfer.

The purchaser of a pre-emption right is regarded as the "legal representative" of the original claimant, under the Act of Congress granting such rights.

The construction of the term "legal representative" at Common Law, depends upon the intention manifested by the party using it, and it has not, therefore, always necessarily the same signification. Such intention is not to be gathered solely from the instrument itself, but in part from concomitant circumstances, the existing state of things, and the relative situation of the parties to be affected by it.

A verdict and judgment which have been set aside for the purpose of a new trial under the statute relating to actions of ejectment cannot, in general, be given in evidence upon the second trial of the same cause between the same parties for any purpose whatever.

EJECTMENT, in the Jo Daviess Circuit Court, by change of venue, having been originally commenced in the County

Court by the appellee against the appellant. The cause
was finally heard in the Circuit Court at the October term
1847, the Hon, Thomas C. Browne presiding, when the jury
rendered a verdict in favor of the plaintiff.

· . The various proceedings in the Court below are very fully
stated by this Court in their Opinion.

The cause was argued early in the term by *E. B. Wash-
burne* and *A. T. Bledsoe,* for the appellant, and by *S. T.
Logan,* for the appellee. At the earnest solicitation of *T.
Drummond,* the counsel for plaintiff in the Circuit Court,
who was not present at the time of this argument, he was
permitted by the Court to argue in behalf of his client, and
was replied to by *A. T. Bledsoe.*

Points and authorities of *A. T. Bledsoe, C. S. Hempstead
& E. B. Washburne,* counsel for the appellant:

The five first errors assigned question the relevancy and
legality of the evidence which the plaintiff was permitted to
give in evidence to the jury in the Court below.

It is insisted that the evidence referred to in the first,
second, third and fifth errors assigned, was entirely irrele-
vant, and had nothing to do with the issue. The rule is,
that the evidence offered must correspond with the allega-
tions and be confined to the point in issue. 1 Greenl. Ev.
§ 52.

The record of the former trial in this case in the County
Court, which was permitted to go to the jury, was not evi-
dence, but was opposed to the plainest and most familiar
principles. Adams on Ejectment, 327, 215. It was utterly
irrelevant and was calculated to lead the jury astray. If
the testimony offered does not prove the issue, or is calcu-
lated to lead the jury astray, it ought to be rejected. 1
Scam. 230; 3 Peters, 336.

The deed was not properly proved. The mode of proof
is statutory, and being in derogation of the Common Law
must be strictly pursued.

The grantor and witness are both dead. What should be

Delaunay v. Burnett.

done in such a case? The foundation for secondary evi-
dence must be laid by showing the death of the witness, and
then the statute provides that proof is to be taken of the
handwriting of the grantor and witness and the examination
of a "competent and credible witness," who shall state on oath
that he personally knew the person whose handwriting he is
called to prove, and well knew his signature, (stating his
means of knowledge,) and that he believes the name of such
person, as party or witness, was thereto subscribed by such
person.

How does the proof of the handwriting of the witness
conform to this proof which the statute requires. The officer
does not certify that Potts is a credible and competent wit-
ness. Potts does not swear that he well knew the signature
of the witness, Kerney. He does not state his means of
knowledge. He does not state that he believes that the
name of Kerney was subscribed by him. He only states
that he is well acquainted with Kerney's handwriting, and
believes the above signature to be his.

The proof of Henry, by whom it is attempted to prove the
handwriting of the grantor of the deed, (Guyard,) is more
formal than the proof of the handwriting of the witness,
(Kerney); but that proof is substantially defective in not
showing that Henry is a competent and credible witness and
that he well knew the signature.

The deed of Guyard to Burnett, conveyed old wharf lot
number three and no more, that lot the grantor intended to
convey and the grantee expected to receive. The deed, the
situation of the parties and of the country, all prove this.

The intention of the parties will govern as to the con-
struction of a deed, and a particular intent must control the
general intent. *Dawes* v. *Prentice*, 16 Pick. 435.

In construing deeds, effect is to be given to every part of
the description if practicable, but if the thing intended to be
granted, appears clearly and satisfactorily from any part of
the description, and other circumstances of description are
mentioned, which are not applicable to that thing, the grant

Delaunay v. Burnett.

will not be defeated, but those circumstances will be reject-
ed as false or mistaken. *Jackson* v. *Moore*, 6 Cowen, 717.

What is most material and most certain in a description
shall prevail over that which is less material and less cer-
tain. *Ibid.*

The rule that the deed must be taken most strongly against
the grantor is never resorted to, even in a deed poll, till every
other rule of construction fails. *Bac. Max.* Rule 3.

A deed, as to the extent of the premises conveyed, must
receive the same construction which would have been given
to it immediately after its execution; the subsequent devel-
opement of facts unknown to the parties at the time of the
conveyance, and in reference to which course they cannot
have contracted, cannot effect its construction. *Van Wyck*
v. *Wright*, 18 Wend. 157.

In the construction of a grant, the Court will take into
consideration the circumstances attending the transaction
and the particular situation of the parties, the state of the
country and of the thing granted at the time, in order to as-
certain the intent of the parties. *Adams* v. *Frothingham*, 3
Mass. 352.

And where the intention of the parties can be discovered
by the deed, the Court will carry that intention into effect, if
it can be done consistently with the rules of law. *Bridge*
v. *Wellington*, 1 Mass. 219; *Wallis* v. *Wallis*, ib. 135; *Mar-
shall* v. *Fiske*, 6 do. 24; *Pray* v. *Pierce*, 7 do. 381.

A clear general description in a deed is not controlled by
any subsequent expressions of doubtful import in respect to
any particular. *Ela* v. *Card*, 2 New Hamp. 175; *Lyman* v.
*Loomis*, 5 do. 408; *White* v. *Gay*, 9 do. 126.

If the description be sufficient to ascertain the estate in-
tended to be conveyed, although the estate will not agree to
some of the particulars in the description, yet it shall pass
by the conveyance, that the intent of the parties may be ef-
fected. *Worthington* v. *Hylyer*, 4 Mass. 196.

Where the grantor in deed described the premises, in the
first, place by fixed, known and visible metes and bounds, as

well as by corresponding courses and distances, and then added a further description, bounding the land on its several sides by the adjoining proprietors, and the grantee claimed land within the latter description, it was excluded by the former. In an ejectment against him from the land, it was held that the intention of the parties apparent from the deed, was not by different descriptions of the premises, to convey different parcels of land, but one and the same parcel, the additional description being of less certainty than the preceding one, was controverted by it, and parol evidence was inadmissible to show the grantor intended to convey the demanded premises. *Benedict* v. *Gaylord*, 11 Conn. 332.

Where the boundaries mentioned in a deed of conveyance are inconsistent with each other, those are to be retained which best subserve the prevailing intention manifested on the face of the deed. *Gates* v. *Lewis*, 7 Verm. 511.

Where the particulars in the description of land in a deed, are inconsistent and incongruous, the Court may reject a part, to give effect to the deed. In doing this they will be guided by the intent of the parties, as gathered from the deed. *Hall* v. *Fuller*, 7 Verm. 100.

It is contended that Burnett is the legal representative of R. P. Guyard, but being a purchaser, he cannot be.

The legal construction of the words "legal representatives," is, the executors or administrators. 1 Roper on Legacies, 108.

Each of the terms, "personal representatives," and "legal representatives," in its strict and literal acceptation, evidently means "executors" or "administrators;" but in cases of wills, as these persons sustain a fiduciary character, it is improbable that the testator would make them beneficial objects of gift, and accordingly in those cases it has been determined to mean *next of kin*. 2 Jarman on Wills, 38.

A representative of a deceased person, sometimes called a personal representative, or legal personal representative, is one who is executor or administrator. 2 Bouvier's Law Dictionary, 317; 6 Mad. 159; 2 Vesey, 402.

In its ordinary sense, the term "legal representatives," is synonymous with the term "executors and administrators." 2 Williams on Executors, and the case there cited of *Price* v. *Strange*, 819.

In the case of *Bennett* v. *Farrar*, 2 Gilm. 598, the Supreme Court of this State has decided that the term legal representatives under the act of Congress, February 5th, 1829, meant executors, heirs or administrators, and not purchasers. That was a suit in relation to a Galena town lot, the controversy arising under the law of Congress of 1829.

*T. Drummond*, for the appellee, examined the errors assigned by the plaintiff in their order.

1. The paper book was admissible. It is a substantial compliance with the law. Rev. Stat. 232. The whole paper book must be taken together, in connection with the certificate, by which it will appear that the records referred to consist of a statement of the number of each certificate, date of entry, purchaser's name, and number and situation of each lot and out-lot in the town of Galena. It is in every respect, therefore, a substantial compliance with the law.

It is like a certificate from a land officer of the various entries in a township, in a section, &c., by lists with a proper heading, in which case it certainly could not be contended, that in each entry there ought necessarily to be a separate and distinct certificate of the register.

This is unimportant at all events, because the special certificate of the register of the 29th of October, 1846, was a literal compliance with the statute, and this error would only present the ordinary case of two deeds from the same party, one of which might be objectionable for mere informality, the other entirely unexceptionable; the admission of the former though improper, would not be error, when the same fact or chain of title was established by the latter.

But it is particularly desired, and in this, I am confident, I speak the sentiment and wish of the whole Galena bar, that the Court should express an opinion upon the question as to this paper book, because it is one constantly arising in

our Courts. When the land office was removed from Galena to Dixon, it was foreseen that some general list of the entries in Galena would be necessary, and to meet this necessity this paper book was obtained; since then it has always been used, and whenever objection has been taken, it has uniformly been overruled by our Courts.

It is to be observed, that though an objection and exception was taken to the admission of the register's certificate of the 29th of October, 1846, no error is assigned upon that point.

2. The Acts of Congress of February 5, 1829 and July 2, 1836, were clearly admissible. They are private Acts. 1 Black. Com. 86, note 21; 14 Peters, 353; 16 do. 234; 2 Howard, 591.

By what general law are town and city lots liable to entry at a land office? There is none. We refer to the Acts and introduce them. If not necessary, there is certainly no error in their admission. But it may well be doubted, whether they are not absolutely necessary in order to show Burnett's right. A man claims property under a private Act of Congress. It would be a most extraordinary doctrine to hold that law inadmissible, more particularly in relation to real estate.

3. The records of the Board of Commissioners were properly admitted. 12 Peters, 418; 2 Howard, 285, 316; 4 do. 421, 449.

They were admissible in order to identify the lot. There was a deed made prior to the entry of the land; of course the land conveyed was to be connected with the entry. The Commissioners' records were the most conclusive and satisfactory proof of that. A confirmation by Act of Congress and the certificate of the Commissioners, entry at the land office, and issuing of Patent, are substantially the same thing. 12 Peters, 454; 2 Howard, 285; 4 do. 458. Wann's testimony was addressed to the Court, (not to the jury,) as preliminary to the introduction of the records.

The only ground of objection that can be made, is, that we cannot go behind the Register's certificate. But this dif-

fers from an ordinary case; usually, the Register's certificate (prior to the issuing of a Patent,) is the only evidence of title. In this case the board were to adjudicate and decide, the Register and Receiver of the Land Office were mere instruments who were obliged to issue a receipt on presentation of the commissioner's certificate.

We do not go behind the Register's certificate to show that it issued improperly, but to sustain it and conform to it, and to establish that our right accrued prior to the entry.

This must always be the rule in like cases. We show our old claim and trace it down, and the reason of the rule is shown by a part of the plaintiff's testimony on the defence in the Court below. In order to defeat us, they introduce a plat made by Captain Craig long before the entry. It is unnecessary to notice the permit book, for, though its admission was objected to and an exception taken, no error is assigned on that point.

4. As to Guyard's deed of October 13, 1829, this was properly admitted in evidence.

In placing a construction on this deed, as to the description, &c., it is just to consider the situation and circumstances of the country. 2 Howard, 316. As to the acknowledgment, it is not necessary that the certificate of the officer should state that the witness was competent and credible. The presumption is, that they are both until the contrary is shown.

The law never contemplated that the magistrate or officer, before whom the proof of a deed was taken, should be the judge of the competency of the witnesses. To be satisfied of this, it is only necessary to consider the very many and difficult questions which arise in determining this point. The witness must be of sufficient understanding, comprehend the obligations of an oath, be free from interest, not a party. 1 Greenl. Ev. § 327. Now, in these matters are frequently involved the most abstruse and difficult questions in the law, and it would be singular if the statute intended to leave the determination of such questions to an officer authenticating a deed. If it did, then their judgment would

seem to be final.　But such is not the law.　4 Johns. 161; 2 Wend. 308; 2 Hill's (N. Y.) R. 612.

If the witness is incompetent and incredible, that fact must be made to appear by the party alleging it.　It is true that the general principle of law is undoubted, that when there is a witness to a deed, you must call him, if within reach of the jurisdiction of the Court, and if not, you must prove his handwriting; but the reason of the rule is exceedingly artificial, and it has been much modified by the current of modern authority.　It is clear that the good sense of the principle, lies not so much in determining who witnessed a deed, as who executed it as grantor.　5 Peters, 319; 22 Pick. 90; 11 Wend. 110; 13 do. 178; 2 do. 576; 2 Johns. 451; 1 Greenl. Ev. §§ 575, 569, 572.　It is conceded, however, that this deed of Guyard is offered under the statute, and we must show a compliance with it.

But it has been repeatedly decided in this and other States, that a literal compliance is not necessary.　2 Scam. 308, 374, 525; 1 Gilm. 116, 160, 302; 3 Ohio, 140; 6 do. 353; 15 do. 423; 6 Blackf. 476; 3 Cowen & Hill's notes, 1247, 1249.

The authentication in this case is a substantial compliance with the law.

In the proof of the handwriting of the subscribing witness to the deed, Mr. Potts does not particularly state his means of knowing the handwriting.　It may be admitted that this should appear to the certifying officer; but the important question is, is it indispensable that it should affirmatively appear in the certificate the officer gives?

The same remark is applicable here as before.　The certificate of the officer has a particular locality—gives the name of the witness, &c.　It is generally in the power of the other party to negative the proof, if any serious doubt is entertained as to the genuineness of the instrument.　The statute only makes the authentication it prescribes, *prima facie* evidence.

The certificates or affidavits attached to the deed do not show that they personally knew the party whose handwriting the witnesses were called on to prove.　But they state they

were "acquainted," and "well acquainted" with the party. These are stronger terms than personal knowledge, because while we know many, we are acquainted with but few. To be acquainted, or well acquainted with a man, is to have a familiar knowledge of him. Then, as to the handwriting of the grantor—the most important—the means of knowledge are given. We do not insist that this authentication follows the precise words of the statute, but their general tenor, scope and spirit. It may be like a declaration on a written instrument, correctly set forth in legal terms, but not contain a word of the original. In leaving this branch of the subject, it may well be borne in mind, that when any doubt is thrown upon a written instrument, it is not the fact that there has been an exact compliance with a statute in all its minute particulars that will remove the doubt, but the contrary. When men commit a fraud in a transaction that a statute requires to be done in a particular manner, they are careful to come up to its very letter, while on the other hand, if everything is fair and honest, they are apt to be heedless and indifferent.

5. The judgments of the County Court were admissible to show the former trials, not as conclusive or as a bar, but to have such weight as the jury might think proper, as in case of doubt, or to rebut presumption arising from possession. 12 Peters, 418, 434, 766, 767; 4 Wash. C. C. R. 477; 25 Wend. 432, 437; 9 Cowen, 233; Adams on Eject. 351, and notes. But if the Court erred in this point it was immaterial, and the judgment will not for that be reversed. 1 Taunt. 12; 6 Bing. 561; 2 Moore, 150; 1 Blackf. 164; 3 do. 222; 5 do. 59; 3 Scam. 18. This principle is peculiarly applicable in a case like this, when the main questions in the cause depend upon documentary evidence.

6. Under this head will be considered the instructions given and refused on both sides; and this brings up the gravest question in the cause—the meaning, effect and operation of Guyard's deed of 1829 to Burnett under the Laws of Congress of 1829 and 1836. And in the first place, what was Guyard's right? It was a right to property, an inchoate right to real estate, and as such, assignable, devisable, de-

scendible. It was at least a possibility coupled with an interest. 11 Wend. 110; 13 do. 178; 1 W. Black. 606; 1 H. Black. 30; 3 Term R. 88; 9 Ohio, 147; 9 Peters, 133; 10 do. 330, 722. If the permit should only be regarded as a license, that would not change it. 15 Wend. 380, &c.

The difficulty and error in this part of the case consist in assimilating this to an ordinary pre-emption, which, in general, is a mere personal privilege.

Here was a survey recognized by authority of law; a permit given in pursuance of law, (14 Peters, 526,) and the Act of 5th February, 1829, itself, recognized the validity of the permits. On the faith of these permits large improvements were made, money expended, and valuable rights of property acquired. A special Act of the legislature had recognized them as valid. Act of January 13, 1836; Laws of 1836, 238, Rev. Stat. Eject. § 57.

These rights have been regarded as property by many of the Acts of the legislature, and by several decisions of this Court. They can be assigned and transferred, and are liable to execution. *Turney* v. *Saunders*, 4 Scam. 527. They pass to an assignee under a decree in bankruptcy. *French* v. *Carr*, 2 Gilm. 664.

Then, as to the question of warranty. It is a general warranty, "warrant and defend the said M. G. Burnett from all other persons except the United States of America:" It is almost precisely like the warranty in *Stoddard* v. *Chambers*, 2 Howard, 284, where, as I have ascertained by a certified copy of the deed, the warranty, by Bell in that case, was to Mackay against heirs, &c., but not against the Government; and this warranty was there held an estoppel. The exception amounts to nothing. In an ordinary general warranty, an Act of the Government, within its constitutional limits, would be no breach. The doctrine of estoppel is sometimes said to be odious, but truly understood, it promotes justice. It is applied to prevent circuity of action.

It operates here. The principle I contend for is, that if a person acquire for himself an inchoate and imperfect right to land, and the perfection or consummation of that right is

dependent upon his holding it, a transfer or assignment of it will prevent him from perfecting it for his own benefit; or if in terms he is the party to perfect the right, it shall, in point of fact, be for the benefit of his grantee. His heirs could not perfect it in such case. A right that had been assigned could not descend to heirs.

This was not a life estate in Guyard, and if he parted with his right or interest, his heirs could not perfect an imperfect right which did not descend to them. This is not the case where one acquires property by title paramount in a third person. 4 Wend. 622; 11 do. 110; 13 do. 178; 3 Metc. 121; 7 Greenl. 96; 4 Kent's Com. 98; 3 Pick. 52; 13 do. 116; 8 do. 153; 24 do. 325, 327; 5 Ohio, 125; *Frisby* v. *Ballance*, 2 Gilm. 141.

As to the difference in the survey, I take this position: If by virtue of a law of Congress, either special or general, a person has the right of perfecting his title to land, by purchase or otherwise, and the boundaries are to be determined by the Surveyor General, or by a board of commissioners, whenever they are determined by the competent authority, such determined boundaries govern and conclude the parties, as well at Law as in Equity, no matter how many other or different boundaries or surveys may have been previously set up by the claimants, nor how many mesne conveyances there may be. *Jourdan* v. *Barrett*, 4 Howard, 169, 421, 449; 3 do. 788.

It is conceded there is a difference between the superintendent's survey and that of the Commissioners. They were identical, as to this lot, only in part The land granted by the deed was neither, exactly. When made, this was only a private survey. It was of no effect till the law of Congress gave it validity. The same law that recognized it, declared that a strip of land along the river should remain forever a public highway. There was only, therefore, as valid, the survey of part of the wharf lots.

But the Commissioners (taking the place of the Surveyor General,) had the right to survey, having regard to the streets

SUPREME COURT.

Delaunay *v.* Burnett.

and lots already surveyed, that is, not rigidly bound by them, but taking the superintendent's survey as their general guide. Now my doctrine is, that the Commissioners having this power, where there is a variance between the old survey and the new, the new survey controls the rights of the parties, because it is the legal Government survey.

By virtue of the permit to the front lot on the river, new lot number three was entered.

But, however it may be, in relation to the warranty and survey, Burnett, under the Act of 1829, is the legal representative of Guyard, and as such, his title to the lot is perfect.

What is the meaning of the term "legal representative," as used in the Act? It may be heirs, devisees, or purchasers—certainly not executors, or administrators.

If the original claimant had transferred his right, then the person to whom the right was transferred *legally represented* him as to that claim; if he died, leaving a will, then the devisee; if without a will, the heir represented him.

The only difficulty as to the question, is the not properly distinguishing as to property. As to personalty, the administrator and executor are always legal representatives, as to realty, never. The only power an executor has over realty, is by the express provisions of the will; that of the administrator is ordinarily to make application to the proper Court to sell it for the payment of debts. 15 Peters, 113.

It may, in principle, be likened to the case of land warrants, in relation to which, it is well settled that they do not go to administrator or executor. See part 2d of Public Lands Instructions, &c. There is no pretence of title in Delaunay. It is a mere naked possession.

The record states in this case the death of Guyard, and an attempt is made, not to establish title in the defendant below, but to make it appear that there is an outstanding title, either in the heirs of Guyard, or in his administrator. The *prima facie* right of Burnett, at least in part, must be admitted. But to set up an outstanding title, it must be clear and unquestionable. 6 Peters, 312, 498; 3 Howard,

Delaunay *v.* Burnett.

759; and yet the record does not show an heir, executor or administrator in existence.

The land is passed "to the legal representatives of R. P. Guyard." If Guyard had been living, and it were passed to him by name and so entered, it may be conceded that his title would be good, at least at law, in spite of his deed of 1829. 12 Peters, 458; though in that case the contrary doctrine was strongly pressed. 12 Peters', appendix 765. But as it is to his legal representative, it becomes immaterial whether Guyard were living, or died leaving heirs, &c. Let us look at the question upon principle. Here were most valuable rights of property. It is notorious that they were improperly transferred from hand to hand; in some instances, particular lots in Galena for thousands of dollars. These transfers are a part of the history of the country, and yet if it be true, that under the law of 1829, a purchaser does not represent the original claimant, he loses his money and the claimant gets the land. And it would be a singular condition of things, if, after the claimant had sold his lot, and received and used the purchase money, at his death his heir, as heir, could have the benefit of that property which his ancestor had already sold; or that the administrator could hold it for the estate of the original claimant. It is apparent that it was never contemplated to produce consequences so unjust and oppressive, by the Act of 1829.

The authorites cited on the other side, Roper, Jarman, Williams and Bouvier, as to the meaning of "legal representative," show that circumstances must determine.

But the important question is not what these elementary writers understand by the terms, but what did the Congress of the United States mean when, in this and similar laws, the term "legal representative" is employed?

This expression has been repeatedly used by Congress in various laws. 1 Land Laws, 122, 90, 132, 115, 153, 453. If the Court will examine these and many other Acts that might be cited, and also some of the cases in Peters, and Howard, already referred to, where these Acts, many of

them, are construed, it will find a uniform course of action upon this point.

Again, Patents are almost every day issued under some such laws, to a man and his legal representatives. It has never been supposed in such a case, if the man had parted with his right, that the grantee could not hold by virtue of the Patent. An examination of the proceedings of all the Boards of Commissioners, who have acted under similar laws, will tend to the same result.· They have uniformly considered the purchaser as representing the original claimant.

The practice of the Board at Galena was uniform in thus construing the law. Such was the construction ,on exactly like Acts by the Boards of Dubuque, Mineral Point, Burlington, &c.

These Acts are the same. 1 Land Laws 549, 562. And see particularly Senate Document for 1835–6, Vol. 1, Doc. 16, pp. 7, 15, 33, 69, &c., where many cases will be found where confirmations were made, as in the present instance.

It is well settled, then, adjudications made by Boards of Commissioners are conclusive. Such is the law of this Court. 2 Gilm. 598. But they are only conclusive when within authority of law; but admitting the expressions in the law of 1829 to be ambiguous, it is perfectly notorious what has been the construction of the Board. In a vast majority of applications, assignees and grantees represented the original claimants. It will not be pretended that the Board had a right to give a certificate to any one. They were bound by the law. When no claimant came forward, as purchaser, heir, devisee, or permittee, to demand the right, they gave it to the legal representative of the original claimant, and let the Act of Congress decide who was such.

This course of action on the part of the various Boards of Commissioners has been sanctioned by Congress and by the Government. In this particular case, the law of 1836 required the Board to file the evidence with the Register and Receiver. Patents have issued to purchasers as legal representatives of their grantors.

In Missouri, similar questions have often arisen under like Acts of Congress, and the case of *Montgomery* v. *Landusky*, 9 Missouri 714, is an authority in point for the doctrine I maintain.

If this be the true construction of the law of 1829, then the various questions connected with the instructions of the Court below become unimportant.

7.   It is unnecessary to examine particularly the questions connected with the motion for a new trial, and for an amendment of the record.

The first has already been fully considered, even admitting that an exception was taken at the trial.   The amendment of the record was a matter of discretion and the refusal was proper, because to amend it in the manner requested, would have spread a fact on its pages which did not occur.   It would be to allow it to speak what a party supposed and understood to take place, and not the actual fact.

On the whole, it is insisted that the judgment below should be affirmed.   There have been three trials in the Courts below, the last of which was with the consent of the plaintiff below, all resulting in the same way.   Full justice has been done between the parties.

The Opinion of the Court was delivered by

Purple, J.   This was an action commenced in the County Court of Jo Daviess county, to recover the possession of a certain lot of ground in the city of Galena.   The declaration contains two counts.   The first count describes the lot as being "Lot No. three, on the east side of Main street, and running back to Water street, on the west side of Fevre river."   The second count describes the lot as being "Lot No. three, on the east side of Main street, and running back to Water street, on the west side of Fevre river, known and designated before the survey of the town of Galena, as a lot situated on Main street, adjoining Peck's warehouse, and bounded by Main street on the west, by Peck's lot on the south and Fevre river on the east."

There were two trials of the cause in the County Court, verdicts in favor of the plaintiff, and new trials granted. The defendant then *moved* the Court for a change of venue in the cause, which motion was allowed, and by agreement the cause was taken to the Jo Daviess County Circuit Court.

On the 9th day of October, 1847, the said cause came on for trial in the said Circuit Court, and the following verdict was returned by the jury: "We, the jury, find the defendant guilty of unlawfully withholding the premises claimed by the plaintiff, as alleged in his declaration, and find that the estate established in the plaintiff on the trial is an estate in fee simple," &c.

The plaintiff first called Charles G. Thomas as a witness, who being sworn, stated that he was acquainted with George Mixter's handwriting; that he had seen him write often, and that he believed the signature to the instrument purporting to be signed by said Mixter to be in the proper handwriting of the said Mixter, and that said Mixter was, at the time the said instrument bore date, acting Register of the Land Office at Dixon, Illinois, and that Galena was in the Dixon Land District, and thereupon the plaintiff offered to read in evidence to the jury the instrument, which was in words and figures following, to wit:

"I, George Mixter, Register of the Land Office at Dixon, Illinois, certify that on the 20th day of February, A. D. 1838, lot No. three, (3) Main and Water street, Galena, Illinois, (which then and now is in the Dixon Land District,) was entered and purchased of the United States in the name of "the legal representatives of R. P. Guyard," which fact of such entry and purchase appears of record in my office.

Given under my hand at Dixon, this twenty ninth (29th) day of October, A. D. 1846.

(Signed)          Geo. Mixter, Register."

The plaintiff then called Dan Stone as a witness, who being duly sworn, said he was acquainted with the handwriting of Samuel Hackelton, and had seen him write, and

believed the signature to be genuine to the certificate, purporting to be signed by him, in the words an 1 figures following, to wit:

"LAND OFFICE, Galena, September 26, 1840.

I hereby certify, that the foregoing entries are correctly copied from the records of this office.

(Signed)    Samuel Hackelton, Register."

Which certificate was at the end of a paper book, purporting to be a statement of the sale of town and out-lots in the town of Galena, Illinois, and which was set down in separate and distinct columns, 1st, the number of the certificate; 2nd, the date of the entry; 3rd, the name of the purchaser; 4th, the number of the lot; 5th, its situation, &c.   And said Stone also stated, that at that time, he (Hackelton) was the acting Register of the Land Office of the Galena Land District, and thereupon the plaintiff offered to read in evidence an extract from said paper book, which showed, that on the 20th day of February, 1838, lot three, Main and Water streets, was entered in the name of "the legal representatives of R. P. Guyard."   Said Stone also stated, that in September, 1840, and prior thereto, the Land Office was at Galena, and was subsequently removed to Dixon.   To the reading of which extract in evidence to the jury, the defendant by his counsel objected, and the Court overruled the objection, and the extract as aforesaid was read to the jury, and the defendant by his counsel excepted.

The plaintiff then offered in evidence two certain Acts of Congress which are as follows:

"An Act authorizing the laying off a town on Bean river, in the State of Illinois, and for other purposes.

1. *Be it enacted, &c.*  That a tract of land in the State of Illinois, at and including "Galena," on Bean river, shall, under the direction of the surveyor of the public lands for the States of Illinois and Missouri, and the Territory of Arkansas, be laid off into town lots, streets and avenues, and into out-lots, having regard to the lots and streets already surveyed, in such manner, and of such dimensions, as he may think prop-

er: *Provided,* that the tract so to be laid off shall not exceed the quantity contained in one entire section, nor the town lots one quarter of an acre each, nor shall the out-lots exceed the quantity of two acres each. When the survey of the lots shall be completed, a plat thereof shall be returned to the Secretary of the Treasury, and within twelve months thereafter the lots shall be offered to the highest bidder at public sale, under the direction of the President of the United States, and at such other times as he shall think proper: *Provided,* that no town lot shall be sold for a sum less than five dollars; and *provided further,* that a quantity of ground of proper width on the said river and running therewith the whole length of the said town, shall be reserved from sale for public use, and remain forever a common highway.

2. *And be it further enacted,* that it shall be the duty of the said surveyor to class the lots already surveyed, in the said town of Galena, into three classes, according to the relative value thereof, on account of situation and eligibility for business, without regard, however, to the improvements made thereon; and previous to the sale of the said lots as aforesaid, each and every person, or his, her, or their legal representative or representatives, who shall heretofore have obtained from the agent of the United States a permit to occupy any lot or lots in the said town of Galena, or who shall have actually occupied and improved any lot or lots in the said town, or within the tract of land hereby authorized to be laid off into lots, shall be permitted to purchase such lot or lots, by paying therefor, in cash, if the same fall within the first class, as aforesaid, at the rate of twenty five dollars per acre; if within the second class, at the rate of fifteen dollars per acre, and if within the third class, at the rate of ten dollars per acre: *Provided,* that no one of the persons aforesaid shall be permitted to purchase by authority of this section more than one half acre of ground; unless a larger quantity shall be necessary to embrace permanent improvements already made.

Approved February 5, 1829."

"An Act to amend an Act entitled "an Act authorizing the laying off a town on Bean river, in the State of Illinois, and for other purposes," approved fifth February, eighteen hundred and twenty nine.

1. *Be it enacted, &c.,* that all acts and duties required to be done and performed by the surveyor of the States of Illinois and Missouri, and the Territory of Arkansas, under the Act to which this is an amendment, shall be done and performed by a Board of Commissioners of three in number, any two of whom shall form a quorum to do business; said Commissioners to be appointed by the President of the United States, and shall, previous to their entering upon the discharge of their duties, take an oath or affirmation to perform the same faithfully and impartially.

2. *And be it further enacted,* that the said Commissioners shall also have power to hear evidence and determine all claims to lots of ground arising under the Act to which this is an amendment, and for this purpose the said Commissioners are authorized to administer all oaths that may be necessary, and reduce to writing all the evidence in support of claims to pre-emption presented for their consideration; and when all the testimony shall have been heard and considered, the said Commissioners shall file with the Register and Receiver of the Land Office at Galena, the testimony in the case, together with a certificate in favor of each person having the right of pre-emption; and upon making payment to the Receiver at Galena, for the lot or lots to which such person is entitled, the Receiver shall grant a receipt therefor, and issue certificates of purchase, to be transmitted to the General Land Office, as in other cases of the sale of public lands.

3. *And be it further enacted,* that the Register and Receiver at Galena, after the Board of Commissioners have heard and determined all the cases of pre-emption under the Act to which this is an amendment, shall expose the residue of lots to public sale to the highest bidder, after advertising the same in three public newspapers at least six weeks prior to the day of sale, in the same manner as provided for the

sale of the public lands in other cases; and after paying to the Commissioners the compensation hereinafter allowed them, and all the other expenses incident to the said survey and sale, the Receiver of the Land Office shall pay over the residue of the money he may have received from the sale of lots aforesaid, by pre-emption as well as at public auction, into the hands of the County Commissioner of Jo Daviess county, to be expended by them in the erection of public buildings, and the construction of suitable wharves in the town of Galena.

4. *And be it further enacted,* that the Commissioners appointed to carry this Act into effect, shall be paid by the Receiver six dollars each, per day, for their services, for every day they are necessarily employed.

Approved July 2d, 1836."

To the reading of which said Acts of Congress in evidence, the defendant's counsel objected and excepted.

The plaintiff then called Daniel Wann, who being sworn, testified that he was one of the acting Commissioners with John Turney and Samuel Leech, under said Act of Congress of 1836; that they, as such Commissioners, kept a record of their proceedings and doings, and employed a clerk, and that he recognized a book then shown to him, as being the said record of their proceedings and doings, and that Phillip B. Bradley was their clerk, and that the entry in the said book was in the handwriting of the said Bradley, and therefrom the plaintiff offered to read in evidence an extract from page 169 of said record, in the words and figures following, to wit:

"The legal representatives of Robert P. Guyard claim Lot No. 3, between Main and Water streets, and in support of their claim produced a certified copy of a permit, granting the same to Robert P. Guyard, dated March 12, 1828, signed Charles Smith, together with evidence of the loss of the original permit.

"The Commissioners are of opinion, that the legal representatives of Robert P. Guyard are entitled to a pre-emption

to said Lot No. 3, embracing twenty-four feet front on Main street and forty seven feet front on Water street, containing .08 of an acre, of the first class."

To the testimony of said witness, and to the reading of said extract from said book in evidence to the jury, the defendant by his counsel objected, and the objection was overruled by the Court; and thereupon the Court permitted the said extract to be read to the jury, to which ruling of the Court the defendant, by his counsel, excepted. The said witness, Daniel Wann, then recognized a book shown to him by plaintiff's counsel, as the original "Permit Book," so called, being a record of the Superintendent of the U. S. Lead Mines, of permits to lots in the town of Galena; that said book was before the said Commissioners, and that they acted upon it. To all which testimony in relation to said Permit Book, the defendant, by his counsel, objected, but the Court overruled the objections.

The plaintiff then called Albion T. Crow, who being duly sworn, testified that he was acquainted with Charles Smith, who was acting Superintendent of the U. S. Lead Mines, at Galena, on March 12, 1828, and that Martin Thomas was the real Superintendent at the time, and that an entry in said Permit Book, bearing date March 12, 1828, was in the handwriting of said Charles Smith; and thereupon the plaintiff offered to read in evidence an entry in said Permit Book, which was in the words and figures following, to wit:

"Robert P. Guyard is permitted to occupy Lot No. 3, Wharf Row, under the usual restrictions.

Galena, March 12, 1828.

(signed)             Charles Smith."

To the reading of which entry in evidence, the defendant, by his counsel, objected, which objection was overruled by the Court, and the said entry read to the jury, to which ruling of the Court, in permitting said entry in the Permit Book to be read to the jury, the defendant, by his counsel, excepted.

The plaintiff then offered to read in evidence to the jury an instrument in writing, purporting to be signed by R. P. Guyard, and the proof and authentication thereof, which was in the words and figures following, to wit:

"For value received, I have this day bargained and sold, and by these presents, do bargain, sell, convey and confirm unto Milton G. Burnett, all my right, interest and claim to a certain lot in the town of Galena, (permit being lost, the number not recollected,) situated on Main street, nearly opposite Lytle & Wann's store, and immediately adjoining Peck's warehouse, and bounded as follows: by Main street on the west, by Peck's lot on the south, and Fever river on the east, running on to the river just below a stone wall, about two or three high, at the edge of low water mark, and to the best of my recollection, it is the third from the corner, Soulard owning the corner and Peck the next lot. To have and to hold the above described lot, with all and singular the improvements thereon: I warrant and defend the said M. G. Burnett, from all other persons except the United States of America. Given under my hand and seal, this the thirteenth day of October, in the Year of our Lord eighteen hundred and twenty nine.

(signed)      R. P. Guyard, [L. S.]

Witness, E. Kerney.

Mineral Point, Oct. 13, 1829.

State of Illinois, }
Gallatin County, }

Before me, William Edwards, the undersigned, acting justice of the peace in and for said county, and State above named, appeared Isaiah L. Potts, who being duly sworn, says, that he was well acquainted with Elliott Kerney, a subscribing witness to a deed made by R. P. Guyard, to Milton G. Burnett, and dated at Mineral Point, October, 13th, 1829, both before and after the date of said deed, up to the time of his death, which was in      and was well acquainted with his handwriting during the whole time, and verily believes the above signature to be Elliott Kerney's,

Delaunay v. Burnett.

who he knows resided in or about Mineral Point, during the whole of 1829 and a part of thirty, to the best of his belief. Given under my hand and seal this 19th day of May, 1845.

(signed)       Isaiah L. Potts, [L. S.]

Sworn to and subscribed to, this 19th day of May, A. D. 1845.

(signed)       William Edwards, [J. P.]

State of Illinois, } ss.
Gallatin County. }

I, Leonard White, clerk of the County Commissioners' Court in and for said county, do certify, that the above William Edwards, who signed the above affidavit, is and was, at the time of taking the same, an acting justice of the peace, duly commissioned and qualified as such, and that full faith and credit are due to his official acts as such.

In testimony whereof I have hereunto set my hand and the [L. S.] seal of said Court, at Equality, this 21st day of May, A. D. 1845.

(Signed)       Leonard White.

Territory of Wisconsin, } ss.
    County of Iowa. }

William Henry, of the town of Mineral Point, in the county aforesaid, being duly sworn, on his oath, says he was acquainted with R. P. Guyard, (whose name appears to the annexed deed of conveyance to Milton G. Burnett, dated at Mineral Point, October 13, 1829,) when said Guyard lived in Galena; also when he lived in Mineral Point. Deponent further states, he has seen much of said Guyard's handwriting, and have seen him write, and knows that said Guyard lived in Mineral Point in the year 1829, and this deponent believes that the signature to the deed hereto annexed, is in the handwriting of said R. P. Guyard.

(Signed)       William Henry. [L. S.]

Sworn to and subscribed before me, James S. Bowden, a justice of the peace, in and for Iowa county aforesaid, this 12th day of June, A. D. 1845.

(Signed)       James S. Bowden, [J. P.]

Territory of Wisconsin, } ss.
    County of Iowa.        }

I, Henry L. Dodge, clerk of the District Court of the
United States, within and for said county and Territory, do
hereby certify that James S. Bowden, whose name appears
to the above affidavit, was, on the day of the date thereof,
and now is an acting justice of the peace, in and for said
county and Territory, duly elected and qualified, and that as
such, full faith and credit are, and of right ought to be given
to all of his official acts. And I further certify, that the
above signature, purporting to be his, is genuine.

    In testimony whereof, I have hereunto set my hand and af-
    [L. s.]   fixed the seal of our said Court, at the clerk's
              office in (the) Mineral Point, in said county, this
              12th day of June, A. D. 1845.

(Signed)         Henry L. Dodge, D. C. I. C., W. T.

Recorded this 13th day of June, A. D. 1845. at nine
o'clock, A. M.

        (Signed)              Jeremiah Bettis, Recorder."

To the reading of which in evidence, as aforesaid, the de-
fendant, by his counsel, objected, *first*, because it was not
properly authenticated; *second*, because of a variance from
the declaration; *third*, it was not such an instrument as title
could enure to plaintiff under, and for other reasons; which
objections were overruled by the Court, and the instrument,
and authentication thereof, were read to the jury, to all of
which the defendant, by his counsel, excepted.

The plaintiff then called William H. Bradley, who being
sworn, said he was acting as deputy clerk of the Jo Daviess
County Court, and thereupon produced the record of the
said Court, and thereupon offered to read in evidence cer-
tain entries from the records of said Court in this suit, when
pending in said County Court. To the reading of all which
entries the defendant, by his counsel, objected, which objec-
tion was overruled by the Court, and said entries were read
to the jury, to the reading of which the defendant, by his
counsel, excepted.

Delaunay v. Burnett.

The plaintiff's counsel then offered the transcript from the Jo Daviess County Court in this State, filed May 20th, 1847, stating that he desired it might be considered in evidence before the jury, as containing a transcript of the entries read from the record. The defendant's counsel objected, which objection was overruled by the Court, to which defendant excepted. The transcript was not, in point of fact, read to the jury, but the Court allowed the transcript to go to the jury, as aforesaid, to which defendant objected, which objection was overruled, and defendant excepted.

The plaintiff then called Charles R. Bennett, who being sworn, testified that he was a surveyor, and that he laid off the town of Galena in 1837, under the direction of the Commissioners, and that he made a plat of the town, which was then produced and recognized by him as one of the original plats. Said witness stated he did not know much about the wharf lots; that he run off the new lots under the direction of the Commissioners aforesaid; that he did not know how the old lots were situated on the ground; if the lines of old lot No. 3, Wharf Row were run out to Main street, they would embrace nearly the present lot No. 3; they would not miss it very much; that he never run off old wharf lots, and only judges from the plat. That the description of the lot in Guyard's deed, extended out to Main street, would take considerable part of the present lot, but only judges from the plat like anybody else, but could not tell what proportion better than any body else looking at the plat; does not know the present occupant of said lot No. 3, Main street. None of the lots under the present survey run to the river. On the cross-examination, said witness testified, that he did not know the boundary line of theold wharf lots; that he judges of the lines only by his eye and the map; that in 1829, there was a road that run into the bottom across the square; that James Craig, a witness on a former trial in this case, was dead.

The plaintiff then re-called Albion T. Crow, who testified that he recollected the old wharf lots, and the old stone wall made by Guyard on said lots, but he did not know whether

wharf lots run to the river or not; that Main street runs now as it did then; that in 1829 the triangular piece of ground between Wharf Row and Main street was a public square, and no permits were ever granted upon said ground; that he was acquainted with Guyard. The defendant occupied present lot No. 3 under the new survey, during the year 1845, and has occupied the same from 1836 to the present time. The Wharf Row lots as surveyed by the Superintendent, did not come up to Main street. The public square between the Wharf Row lots and Main street, was not called Main street in 1829.

Daniel Wann was then re-called by plaintiff, who testified, that all the old wharf lots were changed; three of them were changed to front on Main street by new survey, and a street left along the river. Soulard owned the first lot, and Peck the second lot in 1829. The old wharf lots did not run up to Main street. That in consequence of the street running along the river, the lots 1, 2 and 3 of the Superintendent's survey were extended up to Main street by the Commissioner's survey, the lines of the old survey and the new survey not running in the same direction; present lot No. 3, being bounded by Main and Water streets; that by virtue of the permits to old lots 1, 2 and 3, pre-emptions were granted to new lots 1, 2 and 3.

The plaintiff here rested his case.

The defendant then called Daniel Wann, who testified that he knew the old wharf lots in 1829; that they fronted upon vacant ground which was claimed by nobody, being a public square, and said lots were bounded on the east by the river; the deed of Guyard to the plaintiff of October 13th, 1829, being read to the witness, he stated that he came to Galena on the 30th day of October, 1829, and subsequently, on the 3d of November, 1829, he opened a store nearly opposite wharf lot No. 3, under the style of Lytle & Wann; that there never was any such firm or store here before that time, and that he was not known in the country before October 30th, 1829, nor was his partner Lytle; that such a firm or store as Lytle & Wann never could have been known in

Galena on October 13th 1829; that he never rented any store before he came here, October 30th, 1829; knows he cannot be mistaken in the time of his coming; that in 1829, by the description of said deed, it would have conveyed old wharf lot No. 3.

On cross examination, witness stated that a part of the old wharf lots were taken for a street, and present lot No. 3, Main street, was given in substitution of wharf lot No. 3. He also stated on cross examination, that if the western boundary of the lot conveyed in Guyard's deed, was Main street, the deed conveyed more than old lot No. 3, and would thereby cover more of the present lot No. 3, between Main and Water streets.

Charles Peck was then called by defendant, and being sworn stated, that he came to Galena in 1827; that he was well acquainted with lots in Wharf Row in 1828 and 1829; that said lots were well known and defined as constituting Wharf Row in Galena; that he owned lot No. 2, Wharf Row, in 1829, and had a building thereon at that time, which came up to the front of it; that the said lots fronted on vacant ground, laid out, used, known and occupied as a public square; that at that time there were no lots laid out on the said public square, and nobody at that time claimed any; that Soulard owned the first lot on Wharf Row in 1829, and that old lot number three, Wharf Row, was the lot conveyed by the deed of Guyard to the plaintiff, bearing date October 13, 1829, which deed was read to him; that old wharf lot No. 3 under the old survey, and lot No. 3 under the new survey are different grounds, except a small piece.

On cross examination said witness stated, that if the lines of old wharf lots one and two were extended to Main street, they would embrace part of lots one and two, now owned by him on Main street; that he does not claim all of old lots one and two, but he claims new lots one and two, because he bought them of the United States. Witness also stated on his cross examination, that in 1829 lots one and two, as surveyed then, did not run to Main street, and he did not claim

to Main street for lot two, nor for lot one after he purchased it; that in 1829 he claimed to Fevre river; that by virtue of the permits to old lots one and two, he obtained a pre-emption to new lots one and two, and purchased them of the United States; that since the new survey he claims to Main street, and does not claim to Fevre river; that if the lot in Guyard's deed run to Main street, it conveyed more than old lot No. 3.

A. L. Holmes being then called as a witness for defendant, and being sworn, testified that he was present on a former trial of this cause, and assisted in trying it, and recollects the testimony of James Craig, a witness called and sworn on said trial, who is now dead; that James Craig testified on the said trial, that he, the said Craig, was appointed a surveyor in 1827, by Martin Thomas, then Superintendent of the United States' Lead Mines, to lay off the town of Galena; that he proceeded to lay off and survey said town of Galena into streets and lots, and made a plat thereof, a true copy of which the witness then identified as the same plat which said Craig certified to on said trial, and was a copy of the original plat sent to the proper department at Washington, which said map went to the jury as evidence in the former trial and on this trial; that there were six lots laid off by said survey, and called Wharf Row, on the west bank of Fevre river. That the said Craig further testified on the said trial, that under the Acts of Congress a new survey was made of the town of Galena, in the years 1836 and 1837, under the direction of the United States' Commissioners to lay out the town of Galena, and that he knew the location and boundaries of the lots under the new survey and the old survey; that he had in his possession the field notes of the old survey made by him in 1827; that he had since made a plat and survey, showing the location of the old wharf lots, and of the lots under the survey of 1836 and 1837, which plat of survey and certificate was in the handwriting of said Craig. The witness then produced it to the jury, which he testified was the same plat used on the former trial in this cause, and which said Craig testified he made, and which

correctly represents lot No. 3, Wharf Row, under the old survey, and lot No. 3, Main street, under the new survey, which said Craig testified were only identical to the extent of 144 square feet; and the said witness then explained to the jury, that said Craig testified that wharf lot No. 3 covered only 144 square feet of present lot No. 3, as shown by said diagram; that wharf lots were forty feet front by eighty feet deep, and the present lot No. 3 was twenty four feet front on Main street by forty seven feet on Water street; that the lots under the new survey occupied ground which was vacant under the old survey, excepting the 144 square feet as shown by the diagram.

On the cross examination said witness testified, that Craig said on the former trial, that lots one, two and three under the new survey, were given by the Commissioners in lieu or in substitution for lots one, two and three on Wharf Row, for the reason that a street called Water street was laid out along the bank of the river, which was required by the laws of Congress, and which the Commissioners made one hundred feet wide, covering a part of the ground occupied by the old wharf lots, and that the new lots one, two and three on Main street, were given to persons who had lots on Wharf Row; that he, said Craig, further testified, that the description in Guyard's deed to plaintiff of October 13, 1829, was a very good description of lot No. 3, under the new survey, inasmuch as it was bounded on Main street and by Peck's present lot on the south. It was conceded by both parties on the trial, that Guyard had been dead many years.

The plaintiff then called Charles Bracken as a witness, who testified that he was well acquainted with Guyard, and that he, (Guyard,) lived at Mineral Point in September, October, November and December, 1829.

The counsel for the defendant asked the Court to instruct the jury:

"3. That said deed from Guyard to said plaintiff, dated October 13, 1829, does not prevent the defendant from setting up a title to other and different ground from that described in said deed; that if the jury believe that the defendant had,

at the time of the commencement of this suit, actual and peaceable possession of the ground decribed in said plaintiff's declaration, and that said plaintiff's deed does not cover said ground, then the jury must find for the defendant.

4. That if the jury believe from the evidence, that the ground in dispute is other and different ground from that conveyed in said deed from Guyard to the plaintiff, and said ground in dispute was entered by Guyard's representatives, and the defendant was in possession of the same at the commencement of this suit, then the jury must find for the defendant.

5. That if the jury believe from the evidence, that Guyard conveyed, by his deed of 1829, to the plaintiff, lot No. 3, on Wharf Row, and that the lot described in the plaintiff's declaration is a different lot of ground from lot No. 3, on Wharf Row, then the jury must find for the defendant.

6. That if the jury believe from the evidence, that a part of the lot described in the deed of Guyard to the plaintiff, is covered by the lot described in the plaintiff's declaration, then the jury can find for the plaintiff, that part of the present lot which is identical with the old lot on Wharf Row, and no more."

The Court refused to give these instructions.

The plaintiff then asked the Court to give the five following instructions to the jury:

1. If the jury believe from the evidence, that the right of pre-emption to lot No. 3, under the new survey, was granted by the Commissioners by virtue of the permit for old lot No. 3, then the action of the Commissioners is final and conclusive as to the right of such pre-emption to new lot No. 3.

2. If the jury believe from the evidence, that the lot granted in the deed from Guyard, in 1829, to plaintiff, was a part, or the whole of old lot No. 3, and that the old lot comprehended a part of the new lot No. 3, and that by virtue of the permit to the old lot, a pre-emption was granted to the legal representatives of Guyard, and an entry made in the Land Office of new lot No. 3, in the name of the legal rep-

resentatives of Guyard, then the legal title of the plaintiff is perfect to the new lot, and the deed of 1829 enures to enable the plaintiff to hold the new lot No. 3; and if they further believe that the defendant was in possession of the same, or claimed title or interest therein at the commencement of the action, then the plaintiff is bound to recover.

3. That the difference between the old survey and the new, cannot affect the right of the plaintiff to recover, provided the jury believe that old lot No. 3, comprehended a part of new lot No. 3, and provided further, they believe, that by virtue of the permit to the old lot, a pre-emption was granted to the new lot.

4. That if the jury believe from the testimony, that in the deed of 1829, Guyard claimed to Main street, and by the deed conveyed to Main street, that it is perfectly immaterial whether the permit gave land to Main street, or whether Guyard's claim was good to Main street; still, that an entry at the Land Office in the name of the legal representative of Guyard, would enure to the benefit of Guyard's grantee, (the plaintiff,) for all granted by the deed covered by the entry."

All the foregoing instructions were given, as asked for by plaintiff.

The jury having found a verdict for the plaintiff, the defendant, by his counsel, moved the Court for a new trial, for the reasons that the Court gave improper instructions, and refused proper instructions to the jury; that the Court permitted improper testimony and excluded legal testimony; and that the verdict was against law and evidence; which motion was overruled. The records did not show that the defendant excepted to the opinion of the Court overruling the said motion for a new trial, and he moved to amend the records to show that fact, on affidavit filed, which motion was overruled.

The following are the errors relied on to reverse the judgment in this case:

1. That the Court erred in permitting the plaintiff's counsel to read in evidence to the jury, an extract from a certain

paper book, purporting to be signed by Samuel Hackelton, Register, Galena Land Office.

2. That the Court erred in permitting the plaintiff's counsel to read to the jury two Acts of the Congress of the United States, to wit: the Act of February 5, 1829, (4 Story's Laws U. S., 2163,) and the Act of July 2, 1836, (Ibid. 2463.)

3. That the Court erred in permitting the plaintiff's counsel to read in evidence to the jury what purported to be an extract from a record of the proceedings and doings of certain Commissioners, under the said Act of Congress of 1836, and also permitting Daniel Wann's testimony in relation thereto, to go to the jury.

4. That the Court erred in permitting the plaintiff's counsel to read in evidence to the jury, a certain instrument in writing, purporting to be signed by one R. P. Guyard, and the proof and authentication thereof.

5. That the Court erred in permitting the plaintiff's counsel to read in evidence to the jury, certain entries from the record of the Jo Daviess County Court in this suit, when pending in that Court, and also in permitting the transcript of the proceedings in the Jo Daviess County Court in this suit, to go to the jury without being read, though defendant's counsel insisted upon the same being read.

6. The Court erred in refusing to give the third, fourth, fifth and sixth instructions, as asked for by defendant's counsel.

7. The Court erred in giving the first, second, third and fourth instructions asked for by the plaintiff's counsel.

8. The Court erred in refusing to grant a new trial in this case.

9. The Court erred in refusing to amend the record in this case, as asked for by defendant.

A copy of the original map of the town of Galena, showing the situation of the "Wharf Row" lots, a plat drawn by Capt. Craig, showing the relative positions of the old Wharf lots, and the lots under the new survey of the town of Galena, together with a map of the new survey of the town of

Galena, accompanied the record in this case, and were made part thereof.

The several errors assigned upon this record, and the points arising under them, will be considered in their order.

With regard to the *first,* the Court is of opinion that the objection taken to the certificate of Samuel Hackleton, Register of the Land Office, is too technical to be allowed to prevail. The Act of the General Assembly of this State, of the 10th January, 1827, (Revised Laws, 1833, p 280,) makes the certificate of any Register or Receiver, of any Land Office of the United States, to any fact, or matter on record in his office, competent evidence to prove the fact so certified in any Court in this State; and although the sale and purchase of this lot, which was the fact sought to be proved by the introduction of the paper book, copied from the records of the Land Office, is not literally certified as a fact, the evidence from which alone the officer derives his knowledge, is certified; which is believed to be a substantial compliance with the spirit and intention of the law. However this may be, the certificate of Mixter, as to the propriety of the admission of which in evidence we do not entertain a doubt, proved the same fact beyond all controversy, and left no room for the remotest supposition that the appellant could have been injured by the testimony, even if it had been erroneously admitted.

*Second;* the Court is of opinion that there was no impropriety whatever, in permitting the Acts of Congress to be read to the jury. It is due to counsel to say that this point has not been seriously urged.

*Third;* in relation to the book containing the records of the Commissioners appointed by the President, to determine the claims of lots in Galena, arising under the Acts of Congress before recited. It was fully proved by the testimony of Wann, who was one of the said Commissioners, that this was the book which contained the records of their proceedings, in adjudicating upon, and determining the rights of the several claimants. The proceeding was judicial in its character, and unless disapproved by the Commissioner of the

General Land Office, conclusive evidence of the rights thereby established. This record was the proper and legit-imate evidence to confirm the fact which was sought to be proved by its introduction, to wit: that the "legal represent-atives" of Guyard were entitled to the right of pre-emption, under the Acts of Congress before mentioned, to the lot in controversy in this suit. Taken in connection with the cer-tificate of Smith, granting to Guyard permission to occupy lot No. 3, in the old survey, for the purposes of this suit, the right to a pre-emption to lot No. 3, of the survey made in 1837, in Guyard's "legal representatives" is beyond contro-versy.

*Fourth;* this assignment questions the correctness of the decision of the Court in the admission of the deed from Guy-ard to Burnett in evidence; 1st. because it was not prop-erly authenticated; 2d. because of a variance from the declaration; 3d. because it was not such an instrument as title could enure to plaintiff under.

Whether this deed is, or is not properly authenticated, is to be determined by the construction of a statute of this State, passed January 31, 1827. Rev. Laws, 1833, p. 133, which is as follows:

"Where any grantor, or person executing such deed or writing, and the subscribing witnesses are deceased or cannot be had, the Judge, or officer as aforesaid, may take proof of the handwriting of such deceased party, and subscribing wit-ness or witnesses, (if any,) and the examination of a com-petent and credible witness, who shall state on oath or affirmation, that he personally knew the person whose hand-writing he is called to prove, and well knew his signature, (stating his means of knowledge,) and that he believes the name of such person subscribed to such deed or writing as party or witness, (as the case may be,) was thereto sub-scribed by such person; and when the handwriting of the grant-or, or person executing such deed or writing, and of one subscribing witness, (if any there be,) shall have been prov-ed as aforesaid, the Judge or officer, shall grant a certificate thereof, stating the proof aforesaid."

The certificate in this case, offered to authenticate this deed in relation to the handwriting of Elliot Kerney, the subscribing witness, is quite informal in its character. It is in the form of an *ex parte* affidavit; it does not state that the witness, Potts, was competent and credible, nor does it show his means of knowledge of Kerney's handwriting, other than what may be inferred from the declaration, that he was well acquainted with him; nor that the justice himself, who took the proof, was satisfied therewith.

The proof of the execution of this instrument falls far short of a literal compliance with the provisions of the statute; and while, for the reasons hereinafter given, the admission of the same in evidence, is not adjudged erroneous, the Court is constrained to disapprove and reprobate this laxity of practice, in taking proof and acknowledgment of deeds, as being directly calculated to jeopardize the rights of parties, and promote and encourage vexatious and expensive litigation. Under statutes of a similar character to this, it has been frequently decided, in other States, and indeed under this same statute in this State, that if the prescribed conditions are substantially complied with, this will dispense with a literal, technical compliance with the strict reading of the law. *Wiley* v. *Bean*, 1 Gilm. 302; *Vance* v. *Schuyler*, ib. 160; *Livingston* v. *Kettelle*, ib. 116; *Ayres* v. *McConnell*, 2 Scam. 307; *McConnell* v. *John*, ib. 523; *Watson* v. *Clendenin*, 6 Blackf. 477; *Brown* v. *Farran*, 1–4 Ohio, 508; 15 Ohio, 423. But while we admit that mere form should be disregarded, and should not vitiate in this respect, we ought also to be cautious that we do not discard substance, leave room for the perpetration of forgeries and frauds, and by judicial legislation, nullify the statute.

In view of these principles, authorities and considerations, it is the unanimous opinion of the Court with reference to the proof of the execution of the deed, so far as relates to the proof of the handwriting of Kerney, the subscribing witness, that the statement, that the witness called to prove his signature, "was well acquainted with him," the attesting witness, is equivalent to the declaration that he "personally

knew him." Neither is it considered indispensable, that the officer taking the proof should certify that the witness is "competent and credible." He is not required to do this by the statute. It will be presumed that the witness is "competent and credible," until the contrary is shown by testimony. The Court is equally divided in opinion, as to whether the witness' means of knowledge of the handwriting of the attesting witness should be disclosed by the certificate of the proof of the execution of the deed; consequently that point must remain undecided, and the judgment of the Circuit Court in that respect concerning this particular case, must stand.

As to the question of variance, and whether title can enure to Guyard's grantee under this conveyance, under the view which the Court has taken of this cause, they become entirely immaterial in this, or any other similar proceeding. That the views of the Court may be fully understood upon this question, a brief recapitulation of the material facts is is deemed proper:

On the 12th of March, 1828, Guyard was permitted to occupy lot No. 3, Wharf Row, in Galena. On the 5th of February, 1829, Congress granted to those who had been permitted to occupy, or who had actually occupied lots in said town, and to "their legal representatives," a pre-emption right to the lots so occupied, &c.

Prior to the passage of this Act, in 1827, a survey and plat of the town had been made, whether under authority or or not, does not appear; but it is evident that the Act of Congress aforesaid had reference to the occupation of lots as described in this survey and permits granted under it. It will be further evident from the said Act, and an inspection of the annexed plat,* that the land reserved from sale along the river for the purposes of a highway, would include nearly all of original lot No. 3, Wharf Row; in fact, the evidence justifies the conclusion, that lot No. 3, Wharf Row, and lot No. 3 under the survey made in 1837, are only iden-

---

*See next page.

tical to the extent of 144 square feet. Guyard's deed to Burnett bears date October 13th, 1829. The Act authorizing the President to appoint Commissioners to settle the claims of occupants and those holding permits, was passed in July, 1836. The record does not show at what particular date these claims were adjudicated upon, but the entry of the lot in controversy, in the name of the "legal representatives" of Guyard, was made on the 20th of February, 1838; so that it will be presumed that the action of the Commissioners was but a short time previous to that date. Considering all of the evidence in connection with the determination of the Commissioners, it is proved, that by vir-

tue of his permit, Guyard, at the time of his transfer to
Burnett, was entitled to a pre-emption to lot No. 3, Wharf
Row, and, that after his death by virtue of the same permit,
his "legal representatives," (by the equitable construction
which was put upon the law by the Commissioners,) were
entitled to a pre-emption to lot No. 3 in the survey of 1837.

It is difficult to define the nature and character of an inter-
est or estate, (if it may be so called,) which is acquired by
these pre-emption rights.    Strictly speaking, it is not an es-
tate within any definition known to the Common Law.    It
is not an interest in the legal title; but only a right of occu-
pancy for the time being, with the privilege of purchasing
at some future period at a stipulated price.    Yet, in this
State, by several judicial determinations, it has always been
treated and considered as property which, when not prohib-
ited by Act of Congress, is subject to be transferred, is liable
to be taken and sold on execution, and capable of passing
to an assignee under a decree of bankruptcy.    *Turney* v.
*Saunders*, 4 Scam. 527; *French* v. *Carr*, 2 Gilm. 664.
Without attempting to give a name to this peculiar species
of property in or claim to lands, we will content ourselves by
saying that there can be no question that it is such a right,
or property as may pass by deed or other transfer.    In one
class of cases embraced in the Act of Congress of 1829,
the interest of the  occupant might undoubtedly pass by
parol, accompanied with delivery of possession.    The Act
embraced such as occupied merely, as well as those who
had been permitted (in writing) to occupy.

According to our understanding of the subject, then, Guy-
ard, by his deed of October 13th, 1829, conveyed and sold
to Burnett all the interest which he had acquired, or which
might thereafter be acquired by virtue of his permit to oc-
cupy, and the Law of Congress granting to him and his "legal
representatives," a pre-emption right to lot No. 3, Wharf
Row; and that with regard to the right or interest thus
transferred, within the spirit, meaning and intention of the
Act of Congress, Burnett became the "legal representative"

of Guyard, and moreover, that the entry and purchase of lot No. 3, of the new survey, being in the name of such "legal representative," and being adjudged by the Commissioners to belong to such "legal representative" under the original right acquired by the permit to Guyard; and it not being manifested by the record, that any other person or persons have entered said lot, claiming to represent the said Guyard, the Court will intend that the entry was made by Burnett as such "legal representative," and that the legal title thereby became vested in him.

The doctrines of enuring and estoppel do not apply in this case. In fact, they could not bear upon the questions presented in the record; *first*, because Guyard has made no covenant which would estop him from setting up a title derived from the United States; and *second*, if Burnett is *quoad hoc* the representative of Guyard, there is nothing which can enure.

We have labored under some embarrassment on account of the Common Law definition, and generally received interpretation of the term, " legal representative." Upon a critical examination of the authorities, however, at Common Law, it will be found that the construction of the term depends somewhat upon the intention manifested by the party using it. In Roper on Legacies, Vol. 1, p. 108, it is said: "The legal construction of the words "personal representatives," or "legal personal representatives" is, the executors or administrators of the person described. This legal construction and appointment only take place, when testators have not manifested any intention in their wills to the contrary; for if it appears from the dispositions in the instrument, whether it be a deed or will, that those words are used in reference to other persons than executors or administrators, that intention will prevail." Upon an examination of the doctrine in relation .to this subject, on the succeeding pages of the same work, it will be found that the term "personal representatives," "legal personal representatives," and "legal representatives," may mean executors, administrators or heirs, according to the intention of the party using

them; which is to be gathered from the whole instrument and the attending circumstances.

In Bouvier's Law Dic. p. 357, the term "representative" is defined to be "one who represents or is in the place of another. A representative of a deceased person, sometimes called a "personal representative," or a "legal personal representative," is one who is executor or administrator of the person described."

To the same effect is the doctrine contained in Williams on Ex'rs, Vol. 2, p. 819, *et seq.*

"The construction of the words "legal representatives," or "personal representatives," has presented another perplexing and fruitful topic of controversy. Each of these terms, in its strict and literal acceptation, evidently means executors or administrators, who are, properly speaking, the "personal representatives" of their deceased testator or intestate; but as those persons sustain a fiduciary character, it is improbable that the testator should intend to make them beneficial objects of gift. And almost equally so that he should mean them to take the property as part of the general personal estate of their testator or intestate, which is in effect to make him the legatee. Accordingly, in numerous cases, the term "legal representative," or "personal representative," has been construed as synonymous with next of kin, or rather as descriptive of the person or persons taking the personal estate under the Statutes of Distribution, who may be said, in a loose and popular sense, to represent the deceased." 2 Jarman on Wills, 48.

These authorities are sufficient to establish the position, that the term "legal representative," has not always necessarily the same signification. That there is a question of intention to be considered in its construction, and that this is not to be gathered solely from the instrument itself, but in part from concomitant circumstances, and the existing state of things, and the relative situation of the parties to be affected by it.

Now upon subjects similar to the one involved in this controversy, we believe it will be found that the action of the

Delaunay *v.* Burnett.

General Government has been uniform and consistent in accordance with the principles laid down in this decision; and while we freely admit, that we can find no case precisely parallel in principle to this, with one exception which will hereafter be mentioned, yet the analogies are so strong that we cannot doubt, had this case actually been presented to the highest judicial tribunals of the country, the result would necessarily have been the same as that to which we have arrived. Congress has often granted pre-emption rights to settlers upon the public lands, to occupants of town lots who had made settlements or improvements on the same, while the title to the land remained in the Government. They have also uniformly acknowledged the rights of persons claiming under British, French and Spanish grants, concessions or donations, which had their origin at a period of time anterior to the acquisition of the territory, in which they were situated, to the United States. And the constant and universal practice has been, after recognizing the right to exist in those who had been the beneficiaries of such grant, concession or donation, or their "legal representatives," to appoint commissioners or agents to settle and adjudicate upon the same, and make report of their proceedings in manner required by law.

In some instances, the authorities thus appointed have confirmed the claim to the original claimant and his "legal representatives;" in others, to his "legal representatives;" and again in others, to purchasers by name, claiming through divers mesne conveyances and transfers from the original claimant. And we have not ascertained that in any instance the officers of the Land Office, or Congress, have refused to ratify such acts of the commissioners or agents, upon the ground that a purchaser could not take under the denomination of "legal representative." U. S. Senate Doc. 1835-6, vol. 2; 2 How. 316; 12 Peters, 458. What, then, are we to suppose Congress intended by the term "legal representatives" in the Act of 1829? It has before been shown, that taken in its literal sense, and without reference to intention, it is understood to include only executors and administrators.

But the law says, that by the use of these general terms, it shall not always be presumed that a testator intended to pass his estate to his personal representatives, and, therefore, it shall mean heirs, as well as executors and administrators.

Well, then, is it to be presumed, that when Congress granted the right of pre-emption to Guyard and to his "legal representatives," that it was intended that the right should be limited to him, his heirs, executors and administrators? What good reason can be assigned why, in a case like this, a purchaser or grantee, as to the thing granted or purchased, may not be the "legal representative" of the grantor or vendee, as well as the heir who succeeds to the same estate or property?

Guyard, at the time of his death, had no estate, interest or property in the right or claim to the lot in controversy. He had parted with the whole in 1829. In 1838, this right, which had been thus sold and transferred by him, and in which he had no interest at his death, it is contended, ripened into a legal title in favor of his heirs or administrators, not because they are the real owners of the property, or can legally succeed to a right or claim which their ancestor or intestate had not at his death, but simply for the reason that the grant is to Guyard's "legal representatives."

The case of *Montgomery* v. *Landusky*, 9 Miss. 714, is a case in point, affirming the principle, that a purchaser or grantee may be the "legal representative" of an original claimant, in cases of this character. In coming to this con-clusion, we do not wish it to be understood, that it is the intention of the Court to extend the principle beyond that class of cases to which reference has been made, and to such, only for the reason that it seems to be warranted by the intention of the Acts of Congress, and the constant usage and practice of the Government.

This view of the present case dispenses with the necessity of considering the residue of the errors assigned, and points made under them in this cause. Whether the instructions given or refused, were technically correct, or otherwise; whether the record of the Jo Davies County Court was

properly admitted, is not material, if the Court is right in its conclusions, that Burnett, by the entry of the lot in the name of the legal representatives of Guyard, has acquired the fee simple title to the same. But inasmuch as the counsel have desired an opinion upon all the main points in controversy in the Court below, we do not hesitate to say that, in our judgment, a verdict and judgment which has been set aside for the purposes of a new trial, under the statute of this State relating to actions of Ejectment, cannot, in general, be given in evidence upon the second trial of the same cause between the same parties, for any purpose whatever, and that it would be error if admitted under circumstances where the Court could not clearly see, that the verdict could not be affected by it.

The judgment of the Circuit Court is affirmed with costs.*

*Judgment affirmed.*

---

*Since the decision of this case, the attention of the Reporter has been called to a recent decision in Mississippi, with a request to refer to the same in some way. Not having seen that decision, he adopts the following statement of the case and extract furnished him:

The case is entitled "*The Grand Gulf Railroad and Banking Company* v. *Bryan*," and is reported in 8 Smedes & Marshall, 234. The prominent facts are these: The Act of Congress of the 3d of March, 1803, gave to certain persons and their "legal representatives," the right of pre-emption in the purchase of public lands within the Mississippi Territory, and Commissioners were appointed to decide upon the validity of claims arising under the Act. By the provisions of the Act, Burnett was entitled to a pre-emption to two hundred and forty acres, which, on the 8th of February, 1804, he conveyed to Matlock. Matlock died in October, 1804, and in December, 1805, his administrator, by the order of the Orphan's Court, sold the land to Harmon. In December, 1806, Harmon conveyed to Wallace; and in January, 1810, Wallace conveyed to Patterson, whose heirs subse-

quently conveyed to the Railroad and Banking Company. In December, 1806, the claim was confirmed by the Commissioners to "the legal representatives of Gideon Matlock;" and in January, 1807, the land was entered in the same name, and one fourth of the purchase money paid. In September, 1810, the rest of the purchase money was paid by Patterson. Bryan, the heir at law, of Matlock, filed her bill in Chancery, alleging that the entry and first payment were made for her benefit, and claiming a decree for the land in payment of the amount advanced by Patterson, and interest. The Court of Appeals dismissed the bill on the ground, that the entry and first payment were made by Wallace, the grantor of Patterson, and not by the complainant.

It was insisted on the part of the complainant, that the term, "legal representatives," used in the confirmation and entry, necessarily meant the heirs. In answer to this position the Court say: "But we deny that the words 'legal representatives,' as used in the Act of Congress, mean children, or heirs only. In legal parlance, the executor or administrator is most commonly called the legal representative. Still, in regard to things real, the heir is also the legal representative, and so is a devisee, who takes by purchase. Heirs may be the legal representatives, or they may not. Suppose by will, a testator should give his land to one who is not his heir, the devisee would be the legal representative, in regard to the thing devised. The Act of Congress was evidently intended to have a broader signification than that contended for. This is manifest from the fifth section, which required that any claimant should file with the Register every grant, order of survey, deed, conveyance, or other written evidence of his claim. There was no provision in favor of assignees or grantees, by name, yet we find they were required to present their evidence of title; they were necessarily intended to be embraced by the use of the phrase, 'legal representatives.' If the word 'heirs,' only had been used, it would have excluded assignees and grantees. An assignee or grantee is a legal representative of the assignor or grantor, in regard to the thing assigned or granted. If Congress intended that heirs only should be entitled to rep=

resent the original settler, it is remarkable that the word 'heirs' was not used. Its meaning is well known; it is the appropriate expression, when those on whom the law casts the estate, are spoken of. And as Congress used a phrase more comprehensive, we must suppose that other persons besides heirs were intended. General expressions in a law must be construed to have a general application, unless there be a clear indication that they were intended to be used in a restricted sense."